BARTHOLOMEW F. GUIDA ET AL. *v.* PUBLIC UTILITIES COMMISSION ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued February 7—decision released May 7, 1974

*Edward Becker,* for the appellants (plaintiffs); with him was *Thomas F. Keyes, Jr.,* corporation counsel, for the appellant (named plaintiff).

*Frederick D. Neusner,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the appellee (named defendant).

*J. Read Murphy,* with whom was *Harvey S. Levenson,* for the appellee (defendant The Connecticut Company).

LOISELLE, J. The Connecticut Company, a motor bus company operating in the various parts of the state, petitioned the public utilities commission, hereinafter called the commission, in December, 1971, to increase its fares and to decrease its services in the Hartford and New Haven areas. The petition to amend its rate schedule was filed under General Statutes § 16-19 and the petition to decrease its services was filed under § 16-309. The petitions

were docketed separately but were reviewed by the commission in a single combined hearing during the early part of 1972. During the course of the hearings, the plaintiffs, Mayor Bartholomew F. Guida and the city of New Haven, petitioned the commission to reverse a previous order of March 31, 1971, which approved the transfer of the certificate authorizing the operation of a motor bus line and the utility-related assets of The Connecticut Company to Transit, Inc.[1] The petition of the plaintiffs was denied on April 28, 1972. The commission made its order and finding on the two petitions of The Connecticut Company on May 25, 1972. The plaintiffs appealed from the May 25, 1972 order and finding to the Court of Common Pleas on June 19, 1972.

The Connecticut Company claims that the Court of Common Pleas lacked jurisdiction to entertain this appeal because more than thirty days elapsed between the denial of the plaintiffs' petition and the date the appeal was filed. § 16-35.[2] Whether the

---

[1] Following the transfer, the two companies exchanged names so that Transit, Inc., became The Connecticut Company and The Connecticut Company became Transit, Inc. The final results of these arrangements were that the motor bus certificate and utility-related assets were the property of a corporation again known as The Connecticut Company and certain other assets had become the property of Transit, Inc.

[2] "[General Statutes] Sec. 16-35. APPEALS TO COURT OF COMMON PLEAS. Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the commission, except an order, authorization or decision of the commission approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom to the court of common pleas within thirty days after the filing of such order, authorization or decision. The party so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the commission fixes, to pay all costs in case he or it fails to sustain such appeal."

trial court had jurisdiction must first be determined although the issue was not raised below. *State ex rel. Kelman* v. *Schaffer,* 161 Conn. 522, 527, 290 A.2d 327. While it would appear at first blush that The Connecticut Company's claim is well taken, an examination of the unorthodox procedures taken by the plaintiffs and the commission leads to the conclusion that the court did have jurisdiction to decide the issue.

The motion to rescind and reverse was submitted as part of the proceedings on the two petitions for the increase of fares and the decrease of services. By accepting and considering the petition with the knowledge and in the presence of The Connecticut Company, any procedural infirmities in the presentation of the motion were waived by the commission. The hearing on the plaintiffs' motion became a part of the hearing on the two petitions. The motion was not decided on the basis of a separate procedure but as a part of the proceedings on the petitions of The Connecticut Company. Although a separate document denying the plaintiffs' petition was issued by the commission on April 28, 1972, it was headed by the docket numbers and titles of the two petitions filed by The Connecticut Company. In addition, the reasons underlying the denial of the plaintiffs' petition received extensive discussion in the commission's decision of May 25, 1972, on the two other petitions. Both the plaintiffs and the commission considered the motion and the denial of the motion to be parts of the hearing on The Connecticut Company's two petitions. The appeal from the finding and order relating to the two petitions rather than from the denial itself was proper, and the Court of Common Pleas had jurisdiction to review the action of the commission.

On the other hand, although the procedures followed on the motion to rescind and reverse were unorthodox, The Connecticut Company acquiesced in any procedural error of the commission and cannot now complain. See *Norton* v. *Shore Line Electric Ry. Co.,* 84 Conn. 24, 39, 78 A. 587.

The appeal from the Court of Common Pleas was confined to the ruling of the court upholding the commission's denial of the plaintiffs' petition for revocation of the commission's order of March 31, 1971. The power of the commission to reverse its own action derives from § 16-9 of the General Statutes, which specifies that the "commission may, at any time, for cause shown . . . rescind, reverse or alter any decision, order or authorization by it made." The plaintiffs' basic argument at trial was that the petitions of the company to reduce service and increase rates, less than one month after the approval of the transfer, demonstrated sufficient cause for the commission to reverse itself. In this appeal, they apparently rely on the two legal principles argued in their brief to demonstrate that the trial court erred in upholding the commission's determination. The function of the trial court was to determine on the basis of the record whether the refusal of the commission to rescind the transfer permit under § 16-9 was illegal, arbitrary or an abuse of discretion. General Statutes § 16-37; *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 705, 345 A.2d 563; *Anthony Augliera, Inc.* v. *Loughlin,* 149 Conn. 478, 482, 181 A.2d 596; *Brook Ledge, Inc.* v. *Public Utilities Commission,* 145 Conn. 617, 619, 145 A.2d 590.

The evidence before the commission on the plaintiffs' petition was as follows: On March 16, 1971,

the commission received a letter from the attorney for The Connecticut Company requesting the transfer of its certificate of public convenience and necessity for motor bus operation, No. 200, to a wholly owned subsidiary company named Transit, Inc. Accompanying the letter were the agreement between The Connecticut Company and Transit, Inc., a schedule of assets to be transferred and liabilities to be assumed, and balance sheets showing the assets and liabilities of The Connecticut Company and Transit, Inc., immediately before and after the transfer. The cover letter explained that the purpose of the transfer was to separate the transit bus business from the company's nontransit business and investments and to clarify the financial position of the transit operation if federal subsidies were to be obtained or if a government agency were to assume operation of the transit line. Pursuant to its authority under § 16-309,[3] the commission approved the transfer in its order of March 31, 1971. During the subsequent rate and service hearings, the president and chairman of the board of The Connecticut Company testified that when he purchased the company in 1964 it was badly in need of replacement of equipment but did not have the financial ability to purchase such equipment. At that time,

---

[3] "[General Statutes] Sec. 16-309. CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY. No person, association or corporation shall operate a motor bus without having obtained a certificate from the commission specifying the route and certifying that public convenience and necessity require the operation of a motor bus or motor busses over such route. Such certificate shall be issued only after written application for the same has been made and public hearing held thereon. . . . No such certificate shall be sold or transferred until the commission, upon written application to it, setting forth the purpose, terms and conditions thereof and accompanied by a fee of fifty dollars, after investigation, approves the same."

he and members of his family pledged certain stock in other companies, valued at approximately $6,000,000, for the express purpose of establishing credit so that The Connecticut Company could acquire new equipment.

In its order affirming the transfer, the commission analyzed the evidence produced at the hearing and found that the investments of $6,069,512 referred to by the president of the company were nontransit or nonutility investments. The order further stated that the commission's decision was not predicated on the company's balance sheet but was based "on our analysis of the ability of the revenues being realized under the current schedule of fares to meet current operating expenses."[4] The arguments of the plaintiffs boil down to two propositions, both of which seek to attack the segregation of the stock from the operating transit lines. Their first claim is that the court erred in upholding the refusal of

[4] Generally, regulated companies are allowed to earn a fair return on their investment while furnishing reasonable service at a just cost to the public. *Turner* v. *Connecticut Co.*, 91 Conn. 692, 699, 101 A. 88. In reviewing rates and services of motor transit companies, however, the public utilities commission has rejected the concept of rate of return on rate base. Instead, the commission examines the effect of rates and schedules upon the company's "operating ratio." The operating ratio is calculated by dividing carrier operating expenses by carrier operating revenue and multiplying the quotient by 100 percent. If the product is more than 100 percent, the transit company would be found to be losing money; if less than 100 percent, the transit company was conducted at a profit. The petitions for increased fares and decreased services and the finding and order of the commission were predicated upon this principle. In its application income or loss derived from nonutility assets is not considered in determining rates and services. This is just; otherwise, loss from a nonutility asset, such as a hotel or any other commercial venture, could affect fares and schedules. The plaintiffs make no claim that the use of this principle was irregular or inapplicable in considering the petitions of The Connecticut Company.

the commission to rescind the transfer order in that the funds represented working capital. The second point in the plaintiffs' brief contends that the court erred in upholding that part of the commission's actions which did not require the bus company to establish funded depreciation reserves and did not rescind the transfer order on the ground that the stocks constituted such reserves.

The plaintiffs' contention that the assets segregated from the operating transit company constituted "working capital" was not argued before either the commission or the lower court. Ordinarily, a case cannot be tried on one theory and appealed on another. *Holley* v. *McDonald,* 154 Conn. 228, 235, 224 A.2d 727. Nevertheless, since the subject of this appeal is a matter of substantial public interest, this argument will be considered. Cf. *Kavanewsky* v. *Zoning Board of Appeals,* 160 Conn. 397, 401, 279 A.2d 567; *State* v. *Vennard,* 159 Conn. 385, 406, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625.

In their brief, the plaintiffs claim that the effect of retaining the $6,000,000 in stock as an asset of the nonoperating corporation was to strip the operating company of assets needed as working capital. "Working capital represents an investment in cash, supplies, and other assets that are required to enable the utility to meet current obligations as they arise and to operate economically and efficiently. The amount of working capital required is affected by the average period of time between the provision of service and the receipt of cash in payment for such service." Garfield & Lovejoy, Public Utility Economics, p. 71.

Taking judicial notice of the immediate payment made by public transit patrons, the time between the rendition of service and the receipt of income is negligible. The plaintiffs point out items on the balance sheet of The Connecticut Company relative to cash reserves and expenses, but fail to point out the cash flow or rate of cash flow that would be relevant to determine what amount of "working capital" would be necessary, if any. In the transfer petition, The Connecticut Company included "working funds" in the amount of approximately $15,000 as one of the assets to be transferred to Transit, Inc., along with the operating certificate. To accept the plaintiffs' argument would be to hold that The Connecticut Company, which immediately before the transfer listed assets of approximately $13,000,000, should be required to retain almost half that amount to meet "current obligations," although the investments were not in cash and were never utilized for that purpose. The recital of these facts alone indicates that the position of the plaintiffs is untenable.

The plaintiffs claim that the commission should have compelled The Connecticut Company to set aside funded depreciation reserves as depreciation was taken by the company so that a fund would be present to draw from to buy new equipment as depreciated equipment was discarded. The plaintiffs make no reference to any rule, regulation or custom in this state or to any statutory requirement that would support their claim. The cases they cite are in states which by statute require or authorize an actual setting aside of funds claimed for depreciation. The action of the commission in not requiring a funded depreciation reserve was not contrary to law in view of the declining passenger demand at the time of the commission's order. Since there

was no need for a funded depreciation reserve, this argument fails to demonstrate any error in the action of the trial court in upholding the commission's refusal to revoke the order for transfer.

It has been held that the prerequisite of a change in circumstances for reversal of an administrative ruling is not to be strictly applied to any action of the commission under § 16-9. *Brook Ledge, Inc.* v. *Public Utilities Commission,* 145 Conn. 617, 621, 145 A.2d 590. The plaintiffs, however, have failed to present any argument to this court which would warrant setting aside the transfer which was approved in the commission's order of March 31, 1971. The trial court was correct in ruling that the denial of the plaintiffs' petition was not illegal, arbitrary, or an abuse of discretion.

There is no error.

In this opinion the other judges concurred.