CONNECTICUT NATURAL GAS CORPORATION *v.* PUBLIC UTILITIES CONTROL AUTHORITY ET AL.

COTTER, C. J., BOGDANSKI, PETERS, DALY and BIELUCH, Js.

Argued November 12, 1980—decision released February 13, 1981

*William B. Gundling,* assistant attorney general, with whom were *Robert S. Golden, Jr.,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellant (named defendant).

*Barry S. Zitser,* for the appellant (defendant Division of Consumer Counsel).

*John C. Yavis, Jr.,* with whom were *Susan S. Feltus,* and, on the brief, *John E. Silliman,* for the appellee (plaintiff).

COTTER, C. J. On October 3, 1977, the plaintiff, Connecticut Natural Gas Corporation, a public service company,[1] requested that the defendant Public Utilities Control Authority (PUCA)[2] permit

---

[1] General Statutes § 16-1 defines "[p]ublic service company" to include "gas . . . companies, owning, leasing, maintaining, operating, managing or controlling plants or parts of plants or equipment . . . ."

[2] Effective July 1, 1980, Public Acts 1980, No. 80-482 §§ 40, 348 established the department of public utility control. The head of the department is the public utilites control authority. General Statutes § 16-1b. Under prior legislation the term "public utilities control authority" meant the division of public utility control

amendments to the plaintiff's existing rate schedule, designed to increase the plaintiff's annual revenues by $9,612,396 exclusive of deferred gas cost amortization and related taxes not germane to this appeal. Supporting exhibits and sworn written testimony accompanied the plaintiff's application. See Regs., Conn. State Agencies §§ 16-1-46, 16-1-55.

During December, 1977, and January, 1978, the PUCA held public hearings and made an investigation pursuant to General Statutes § 16-19(a). The PUCA hired James Rothschild, of the firm of J. Rothschild Associates, to participate in considering the application and to cross-examine some of the witnesses who appeared at the hearings before the PUCA. Rothschild did not testify, had no role in enforcing the PUCA's orders, and was not associated with any party to the proceedings.

The PUCA heard the final arguments of counsel and closed the record on January 27, 1978. At the close of the hearings, PUCA employees, including Rothschild, submitted their reports to the PUCA. Rothschild's report discussed the plaintiff's cost of capital, cost of common equity, capital structure, tax credits and rate of return. The report specifically attacked the testimony of John M. Kingsland, one of the plaintiff's witnesses, and said that the corporation's requested return on equity appeared to be excessive.

(division) within the department of business regulation. Public Acts 1978, No. 78-303 § 79. Public Acts 1980, No. 80-482 deletes references in the General Statutes to "division" and substitutes the "department." This legislation does not affect the substantive law governing this appeal. Throughout this opinion we refer to the PUCA in the broader sense, consistent with statutes in effect at the time of the administrative action under review.

At the PUCA's subsequent public deliberations the Rothschild report came to the plaintiff's attention. On February 6, 1978, the plaintiff wrote to the PUCA objecting to Rothschild's methodology for calculating a rate of return on common equity.[3] On February 22, 1978, the plaintiff moved for leave to cross-examine Rothschild. Such leave was not granted.

The PUCA authorized a $1,782,000 increase in rates on March 2, 1978. The plaintiff filed an amended schedule of rates in accordance with the authorization. On March 16, 1978, after the increase became effective, the plaintiff petitioned for judicial review of the PUCA's decision. The office of consumer counsel[4] was allowed to intervene as a party defendant.

On December 11, 1978, the plaintiff requested an additional rate increase. On May 21, 1979, before the Superior Court decided the appeal from the 1978 rate decision, the PUCA granted the plaintiff an additional rate increase of $3,912,388. No appeal was taken from that increase.

On July 3, 1979, the Superior Court filed its memorandum of decision in the appeal of the 1978 rate increase. The court ordered the PUCA: (1) to determine the actual "lag" time for working

---

[3] The letter conveyed the plaintiff's comments regarding the Rothschild report and requested the PUCA to consider those comments in evaluating the report. The letter conceded that the first sixteen pages of the report contain an evaluation of the evidence of record, that such evaluations are generally within the role of a staff member, and that the PUCA could use the record to evaluate the relative merits of the witnesses' testimony and the report's observations and opinions.

[4] Effective January 1, 1979, the office of consumer counsel became the division of consumer counsel. Public Acts 1977, No. 77-614 §§ 164, 610.

capital; (2) to allow the plaintiff to cross-examine Rothschild and rebut evidence in his report; (3) to consider the effect of federal taxes upon the plaintiff's increased revenue; (4) to allocate the tax savings from the plaintiff's participation in consolidated tax returns; (5) to adjust and normalize the plaintiff's extraordinary tax items; (6) to estimate the plaintiff's future federal income tax payments at an effective rate of 14.588 percent; (7) to recompute peak gas demand; (8) to add to the plaintiff's working capital the cost of some gas which the PUCA had omitted in computing the plaintiff's total purchased gas requirements; (9) to compute the impact of the elimination of the gross revenue tax from the Purchase Gas Adjustment (PGA) necessitated by a PUCA error; (10) to reduce the rate of interest which the PUCA had ordered the plaintiff to pay its customers for using money due them which had been refunded to the plaintiff by its pipeline suppliers; and (11) to calculate interest from the actual date the plaintiff had received the pipeline refunds.

On July 5, 1979, the Division of Consumer Counsel (DCC)[5] requested the Superior Court to reconsider and revise its order, claiming, inter alia, that the 1979 rate decision of the Division of Public Utility Control[6] which granted the plaintiff an additional $3,912,388 increase in annual revenues superseded the 1978 rate decision and thereby mooted the appeal. The PUCA joined in that request. The court, on October 12, 1979, denied the motion. On November 13, 1979, we granted the PUCA's and the DCC's petitions for certification to review the court's orders of July 3, 1979, and October 12, 1979.

[5] See footnote 4, supra.

[6] See footnote 2, supra.

## I

The power to fix or regulate public utility rates derives from the police power of the state. The legislature determines the methods by which and the extent to which the state will exercise that power. *New Haven* v. *New Haven Water Co.,* 132 Conn. 496, 511, 45 A.2d 831 (1946). The principle "that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable," limits the PUCA's ratemaking power. General Statutes § 16-19e(a)(4). The public service company, however, has "the burden of proving that . . . [the] rate under consideration is just and reasonable." General Statutes § 16-22.

The PUCA's rate-making must follow the requirements of the Uniform Administrative Procedure Act (UAPA); General Statutes §§ 4-166 through 4-189; for "contested cases." General Statutes § 4-166(2). Under those requirements the PUCA shall afford all parties an opportunity "to respond and present evidence and argument on all issues involved"; General Statutes § 4-177(c); and to "conduct cross-examinations required for a full and true disclosure of the facts." General Statutes § 4-178(3).

Section 4-183 of the UAPA governs appeals to the Superior Court from decisions of the PUCA. General Statutes § 16-35. Judicial review of PUCA decisions may not extend beyond the administrative

record. General Statutes § 4-183(f). A reviewing court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. General Statutes § 4-183(g); *Hospital of St. Raphael v. Commission on Hospitals & Health Care,* 182 Conn. 314, 318, 438 A.2d 103 (1980); *Hansen v. Norton,* 172 Conn. 292, 294, 374 A.2d 230 (1977). Despite infirmities in the PUCA's methods, a court must approve its rate order, if the total effect of the order is just and reasonable. *Woodbury Water Co. v. Public Utilities Commission,* 174 Conn. 258, 264, 386 A.2d 232 (1978); see *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S. Ct. 281, 88 L. Ed. 333 (1944); *Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 120, 540 P.2d 775 (1975); *Rhode Island Consumers' Council v. Smith,* 111 R.I. 271, 302 A.2d 757 (1973). A regulatory agency does not moot an appeal from a rate order by issuing a more recent order. *Potomac Electric Power Co. v. Public Service Commission,* 402 A.2d 14, 22–23 (D.C. App. 1979).

## II

We begin our review of the court's July 3 order by considering one of its two parts which relate to the Rothschild report. The Rothschild report estimated that the plaintiff's receipt of payments from its customers for gas lagged ten days behind the plaintiff's payments to its gas suppliers. The PUCA also estimated this lag to be ten days. This was the only PUCA ruling which the court attributed to the Rothschild report. The court concluded that the PUCA's use of this estimate required a remand. We disagree.

The PUCA included working capital in the plaintiff's rate base. Simply stated, working capital is the assets which the plaintiff needs to pay its operating expenses while awaiting the receipt of revenue from its customers. The more time between the plaintiff's payment of its bills and its receipt of cash from its customers, the more working capital it requires. *Guida* v. *Public Utilities Commission,* 166 Conn. 328, 335, 348 A.2d 613 (1974). In previous cases, the PUCA assumed this lag was forty-five days for all the plaintiff's operating and maintenance expenses, including the cost of purchased gas. The trial court decided that until the PUCA gave the plaintiff notice of a proposed change and an opportunity to prove that the actual time lag exceeded the new estimate the PUCA must continue to assume a forty-five day lag instead of using an estimate less favorable to the plaintiff.

The length of the lag period is a question of fact. Therefore, neither the plaintiff nor the PUCA could safely rely on a previous approximation as if it were a legal precedent. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission,* 116 R.I. 356, 385, 358 A.2d 1 (1976). Consequently, the PUCA did not have to notify the plaintiff that it might employ a new estimate. Although the hearing provided the plaintiff with an adequate opportunity to prove its actual lag, the plaintiff and the PUCA agree that the record does not establish any lag period. Therefore the plaintiff suffered no legal injury when the PUCA estimated the fuel expense lag as ten days, and no prejudice may be attributed to the Rothschild report on that basis.

## III

### A

The court exceeded its authority by ordering a specific remedy, cross-examination and rebuttal, to correct errors it perceived in the PUCA's consideration of the parts of the Rothschild report which discuss the return on common equity. *Watson* v. *Howard,* 138 Conn. 464, 469–70, 86 A.2d 67 (1952). Furthermore, the court erred in considering the entire Rothschild report as evidence which the plaintiff was entitled to cross-examine. Therefore the court did not decide whether improper evidence affected the PUCA's determination that a 13.29 percent return on common equity satisfied the statutory standard or whether substantial proper evidence supported that determination if it was unaffected by improper evidence. We remand those issues to the trial court. On remand the following discussion should guide the court's consideration of the Rothschild report's impact on the PUCA's decision.

Administrative decision-making necessarily includes at least five steps: (1) taking evidence; (2) weighing the accuracy and credibility of the evidence; (3) determining basic facts from a consideration of the evidence; (4) determining whether to infer the ultimate facts mentioned in the controlling statute from the basic facts; and (5) applying the statutory criteria to the findings of ultimate facts. *American Broadcasting Co.* v. *Federal Communications Commission,* 179 F.2d 437, 444 (D.C. Cir. 1949); *Saginaw Broadcasting Co.* v. *Federal Communications Commission,* 96 F.2d 554, 559 (D.C. Cir.), cert. denied sub nom. *Gross* v. *Saginaw*

*Broadcasting Co.,* 305 U.S. 613, 59 S. Ct. 72, 83 L. Ed. 391 (1938); *New Jersey Bell Telephone Co.* v. *Communication Workers of America,* 5 N.J. 354, 375, 75 A.2d 721 (1950).

After taking evidence, the PUCA must analyze it and make findings of fact[7] and conclusions of law. General Statutes § 16-19(a). Summaries and analyses of record evidence produced by this decision-making process after the initial evidence gathering step are not themselves evidence and do not entitle a party to cross-examine their authors and rebut their accuracy. *Commonwealth* v. *Commonwealth Public Utility Commission,* 17 Pa. Commw. Ct. 351, 331 A.2d 598 (1975); *Smith* v. *Pennsylvania Public Utility Commission,* 192 Pa. Super. Ct. 424, 162 A.2d 80 (1960).

In its analysis and evaluation of the record evidence the PUCA may employ its "experience, technical competence, and specialized knowledge"; General Statutes § 4-178(4); and members of the agency may communicate with one another and "have the aid and advice of one or more personal assistants."[8] General Statutes § 4-181. Further-

---

[7] "Findings of fact shall be based exclusively on the evidence and on matters officially noticed." General Statutes § 4-177(g).

"[General Statutes] Sec. 4-178. EVIDENCE IN CONTESTED CASES. In contested cases: . . . (4) notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

[8] General Statutes § 16-50 authorizes the PUCA to employ "such accountants . . . experts, consultants and agents as it may require." Its employees have "expertise in public utility engineering and accounting, finance, economics, computers and rate design." General

more, subordinates may advise the PUCA which accounting method to use in its consideration of the various parts of a rate increase application. *Woodbury Water Co.* v. *Public Utilities Commission,* supra, 266. Competent subordinates may sift and analyze evidence, recommend findings of fact and conclusions of law, and draft orders for an administrative agency as an integral part of the process. *Morgan* v. *United States,* 298 U.S. 468, 481, 56 S. Ct. 906, 80 L. Ed. 1288 (1936); *Seacoast Anti-Pollution League* v. *Costle,* 572 F.2d 872, 881 (1st Cir.), cert. denied sub nom. *Public Service Company of New Hampshire* v. *Seacoast Anti-Pollution League,* 439 U.S. 824, 99 S. Ct. 94, 58 L. Ed. 2d 117 (1978); *Park Building Corporation* v. *Industrial Commissioner,* 9 Wis. 2d 78, 86, 100 N.W.2d 571 (1960).

Accordingly, those parts of the Rothschild report, e.g., pp. 1, 4, 5, 9–12, which consist of analysis or summary of the record evidence or which point out inconsistencies in the plaintiff's witnesses' testimony or the lack of support in the record for some of their opinions are not evidence. Therefore the plaintiff had no right to rebut those parts or to cross-examine Rothschild about them.

Part of the Rothschild report, e.g., pp. 13, 14, however, may contain extra-record evidence. At the public hearing the PUCA informed the parties that

Statutes § 16-2(f). If "employed to make or conduct a special inquiry, investigation, [or] examination," they are exempt from the classified service. General Statutes § 5-198(n).

The trial court concluded that General Statutes § 16-2(j) forbids the hiring of any association, partnership or corporation. We disagree. Subsection (j) of § 16-2 merely forbids certain relationships between the PUCA's members or staff and entities which agree to accept consideration for appearing, agreeing to appear, or taking any other action on behalf of another person before the PUCA or other specified state agencies.

it would take administrative notice of Moody's Index of Stocks and Bonds. The Rothschild report's analysis of the plaintiff's list of gas distribution companies which earned 16 percent or more on equity in any of the previous five years, however, cites both Moody's Public Utility Manual and Value Line. Although Rothschild read some information from Value Line into the record during his cross-examination of Kingsland, we have not determined whether the record contains all of the material cited in the report.

## B

The inclusion of improper evidence[9] in the record upon which the decision is based does not, however, by itself, invalidate the decision. *Madow* v. *Muzio,* 176 Conn. 374, 382, 407 A.2d 997 (1978); *Lawrence* v. *Kozlowski,* 171 Conn. 705, 714, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977). See *Market Street Ry. Co.* v. *Railroad Commission,* 324 U.S. 548, 561–62, 65 S. Ct. 770, 89 L. Ed. 1171 (1945); *Marathon Oil Co.* v. *Environmental Protection Agency,* 564 F.2d 1253, 1265 (9th Cir. 1977); *Appeal of Nationwide Ins. Co.,* 120 N.H. 90, 411 A.2d 1107 (1980). But the use of improper evidence requires a remand only if a party has affirmatively shown substantial prejudice. *Madow* v. *Muzio,* supra; *Lawrence* v. *Kozlowski,* supra, 713–14; see *United States* v. *Pierce Auto Freight Lines,* 327 U.S. 515, 528–30,

---

[9] Before an administrative agency may lawfully rely on material nonrecord facts within its special knowledge and experience or which it has learned through investigation, it must allow a party adversely affected thereby an opportunity to rebut at an appropriate stage in the proceedings. *Feinson* v. *Conservation Commission,* 180 Conn. 421, 428–29, 429 A.2d 910 (1980); *Parsons* v. *Board of Zoning Appeals,* 140 Conn. 290, 292–93, 99 A.2d 149 (1953); *Carroll* v. *Public Utilities Commission,* 25 Conn. Sup. 459, 461–62, 207 A.2d 278 (1964).

66 S. Ct. 687, 90 L. Ed. 821 (1946); *N.L.R.B.* v. *Johnson*, 310 F.2d 550, 552 (6th Cir. 1962); *Pennsylvania R. Co.* v. *Department of Public Utilities*, 14 N.J. 411, 428–30, 102 A.2d 618 (1954).

Reliance on extra-record evidence for important facts demonstrates substantial prejudice.[10]  *Seacoast Anti-Pollution League* v. *Costle,* supra, 881 n.19.  Furthermore, an agency's recital that it did not rely on extra-record evidence does not forestall an independent investigation of the record by the reviewing court.  Id., 881 n.20.

Nevertheless, although the PUCA stipulated that it considered the Rothschild report during the rate-making process, a reviewing court must assume, unless the contrary appears from the record, that the PUCA's final decision did not rely upon whatever extra-record evidence the report may contain. *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles,* 165 Conn. 559, 568, 345 A.2d 520 (1973).

[10] In determining whether substantial evidence supports the rates allowed by the PUCA the trial court must exclude any nonrecord evidence contained in the Rothschild report because the plaintiff had no opportunity to rebut it or to cross-examine its proponent. *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 271, 320 A.2d 811 (1973).

Ordinarily courts must affirm agency decisions supported by substantial evidence in the record.  The substantial evidence rule, however, does not require a court to affirm an agency decision that rests, even in part, on extra-record evidence, if the record evidence would also allow a court to affirm a contrary result had the agency so decided.  This exception to the substantial evidence rule recognizes that in such circumstances any extra-record evidence credited by the agency in reaching its decision may have tipped the balance. *Seacoast Anti-Pollution League* v. *Costle,* 572 F.2d 872, 881 n.19 (1st Cir.), cert. denied sub nom. *Public Service Company of New Hampshire* v. *Seacoast Anti-Pollution League,* 439 U.S. 824, 99 S. Ct. 94, 58 L. Ed. 2d 117 (1978); Report to the Select Committee on Ex-Parte Communications in Informal Rule-making Proceedings, 30 Ad. L. Rev. 377, 398 (1978).

This presumption is particularly strong when, as here, a party alerted the PUCA to possible extra-record evidence in the report.

We have overruled the trial court's determination of prejudice in the estimation of the lag period. The court found no other prejudice from the consideration of the Rothschild report. The court's apparent belief that consideration of the report, by itself, required a remand may have caused the court to fail to specify other ways in which the Rothschild report prejudiced the plaintiff. On remand the trial court may reexamine the question of prejudice.

## C

The plaintiff claims three items of ex parte evidence in Rothschild's report affected the PUCA's determination of the fair rate of return: (1) selection of the discounted cash flow (DCF) method for determining the plaintiff's rate of return on equity; (2) selection of certain market-to-book ratios; and (3) selection of an "expected" 13 percent rate of return on equity. Our review of the record, however, completely disposes of two of these claims and partially decides the third.

First, Rothschild's report used the Discounted Cash Flow (DCF) formula to test the reasonableness of the plaintiff's requested rate of return on common equity and to recommend a lower rate of return, but did not introduce extra-record evidence in support of that formula. Furthermore, Rothschild's cross-examination of Kingsland gave the plaintiff notice of the DCF method of determining a rate of return on equity. Kingsland testified that he rejected the method and explained why. Thus,

the record indicates that the plaintiff had an adequate opportunity to explore any deficiencies in this method. Furthermore, in arriving at 13.29 percent as the cost of common equity, the PUCA recognized that none of the approaches used by various experts could possibly determine with mathematical precision the future return expected by investors before they will invest in the common equity of a company. Consequently, the PUCA did not bind itself to the DCF method or any mathematical formula but determined the appropriate cost of common equity by analyzing and evaluating all the evidence before it. Therefore, no prejudice resulted from the PUCA's consideration of Rothschild's use of the DCF formula.

Second, Kingsland testified that CNG's stock had a market-to-book ratio of 1.33 on December 19, 1977; 1.12 on September 30, 1977; and 1.07 on June 30, 1977. Although the Rothschild report adopted the most recent and highest ratio, all of this evidence supports the PUCA's statement that "the market price of CNG shares exceeds book value." Therefore, this part of the Rothschild report did not unfairly prejudice the plaintiff.

Third, although a lay agency may not resolve questions beyond its ordinary knowledge and experience without the support of expert testimony; *Feinson* v. *Conservation Commission,* 180 Conn. 421, 428, 429 A.2d 910 (1980); an expert regulatory agency may treat the testimony of expert witnesses as to which conclusions they would draw from facts of record as mere argument, which, if reasonable, may help the agency arrive at its decision; *Jaffe* v. *State Department of Health,* 135 Conn. 339, 348–51, 64 A.2d 330 (1949); see *Market*

*Street R. Co.* v. *Railroad Commission,* supra, 560; but which the agency may disregard if contrary to its knowledge or experience. *Bonwit Teller & Co.* v. *C.I.R.,* 53 F.2d 381, 383 (2d Cir. 1931), cert. denied, 284 U.S. 690, 52 S. Ct. 266, 76 L. Ed. 582 (1932); *Jaffe* v. *State Department of Health,* supra. Thus, the plaintiff's expert opinion testimony that raising and supporting equity capital required a particular rate of return did not bind the PUCA. *Baton Rouge Water Works Co.* v. *Louisiana Public Service Commission,* 342 So. 2d 609 (La.), cert. denied, 434 U.S. 827, 98 S. Ct. 105, 54 L. Ed. 2d 86 (1977).

## IV

The remainder of the trial court's order does not involve the Rothschild report.

On four tax related questions the trial court erred by ordering the PUCA: (1) to consider the increase in taxes resulting from increased revenue; (2) to allocate the benefits from the plaintiff's filing of consolidated tax returns; (3) to adjust and normalize data to eliminate extraordinary items in computing the plaintiff's federal taxes; and (4) to estimate the plaintiff's effective tax rate at 14.588 percent. *Woodbury Water Co.* v. *Public Utilities Commission,* supra, 263; *Watson* v. *Howard,* supra, 469–70.

First, part of the rate-making process attempts to predict the regulated utility's future expenses, including income taxes. The PUCA approached that task by deriving a predicted income tax rate and applying it to all the plaintiff's projected revenues. Thus, the court erred in finding that the PUCA did not compensate for the additional taxes which the plaintiff might pay because of the increased revenue.

Second, the plaintiff and several associated companies have elected to file a consolidated tax return. As a result the plaintiff's actual income tax liability depends on the fortunes of the group. Historically, utility companies which participate in consolidated tax returns pay less tax than if they file separately. A lower tax expense benefits the ratepayers because it results in a lower cost of service. The PUCA may reduce the plaintiff's expenses by the full amount of tax savings which results from the plaintiff's participation in a consolidated tax return. *Federal Power Commission* v. *United Gas Pipe Line Co.*, 386 U.S. 237, 87 S. Ct. 1003, 18 L. Ed. 2d 18 (1967). If the PUCA did not, the ratepayers would pay for non-existent expenses. Because the plaintiff's stockholders receive their compensation through a return on equity the PUCA need not apportion any part of the reduction in tax expenses to them.

Third, the PUCA's decision stated its belief that a representative period, broad enough to level off the peaks and valleys of individual years, should be used to predict the plaintiff's future income tax rate. The PUCA chose the five-year period 1972–76 as the representative period. The PUCA decided that the average effective tax rate for that period best predicted the plaintiff's future tax rate. That method would adequately normalize the plaintiff's tax expenses.

Fourth, as part of that method the PUCA could make the adjustments required by its expert judgment to determine the plaintiff's effective tax rate for each year. To protect public service companies from arbitrary treatment, however, the PUCA must explain its adustments so that a court may review its action. The PUCA's decision and briefs adequately

explain its reasons and methods for all of these adjustments except the last step in the formula by which it arrived at 13.5 percent effective tax rate

| Description | Taxable Income Per Returns | Tax Per Returns | Tax Rate |
|---|---|---|---|
| 1972 Greenwich | $727,570 | $263,030 | 36.2% |
| (CNG) | (456,557) | -0- | -0- |
| | $271,013 | | 36.2% |

$271,013 \times 36.2\% = \$98,107$

$\$98,107 \div 727,570 = 13.5\%$ effective rate

for 1972:[11] Because the PUCA failed to provide a rational explanation for choosing the result of the final equation as the effective tax rate we are unable to review this result and therefore order the trial court to remand the case to the PUCA. On remand the PUCA may explain this part of its procedure or may recompute the plaintiff's tax expense using any understandable, lawful method. *Watson* v. *Howard,* supra, 469–70.

# V

## A

We now discuss the five remaining parts of the court's order. The trial court erred when it ordered the PUCA to change its method for calculating peak gas demand. *Arterburn Convalescent Home* v. *Commission on State Payments to Hospitals,* 176 Conn. 82, 86, 405 A.2d 48 (1978): *Woodbury Water Co.* v. *Public Utilities Commission,* supra, 263–64.

---

[11] The PUCA's decision explains why it adjusted the 1972 data. Prior to 1975 the plaintiff consisted of two separate entities which filed separate tax returns. "[I]n 1972 total taxes paid by the two companies amounted to $263,030. If the taxable income as shown on the returns during this year are added a combined taxable income of $271,013 results. This would produce an effective tax rate of about 97%. Since the maximum Federal Income Tax rate in effect in 1972 was 48 percent the effective 97% tax rate is totally unreasonable."

The decision, however, does not explain why the PUCA chose the mathematical formula that it used to adjust the 1972 data. We can perceive no reason why that formula would yield an effective tax rate.

## B

The PUCA admitted in the trial court that it underestimated the plaintiff's total purchased gas requirements. Since a larger required inventory entails more working capital, the trial court correctly remanded so that the PUCA may determine whether the need for added capital justifies a higher rate.

At the time of the PUCA's error the purchased gas adjustment (PGA) compensated for both the extra cost of this gas and the added gross earnings tax which resulted from the miscalculation. On October 1, 1978, seven months after the PUCA's decision, Public Acts 1978, No. 78-370 amended General Statutes § 16-19b (a) to eliminate the gross earnings tax from the PGA. The trial court erred in ordering the PUCA on July 3, 1979, to compute the impact of this legislation on the PUCA's error.

## C

The PUCA ordered the plaintiff to credit its customers with 7 3/4 percent interest on money which its gas suppliers had refunded to it. The PUCA's decision states that it chose 7 3/4 percent because that was the prime interest rate during the period when the plaintiff held the customers' money. The court ordered the PUCA to reduce the interest on the ground that at the time of both the PUCA's and the trial court's decisions General Statutes § 37-3a limited court ordered interest on judgments to 6 percent.[12] General Statutes § 37-3a does not apply to interest payments ordered by the PUCA. General

---

[12] General Statutes § 37-3a provided in relevant part: "[I]nterest at the rate of six per cent a year, and no more, may be recovered and allowed in civil actions, including actions to recover money loaned at

Statutes § 16-19e (a) (4) mandates that the PUCA establish rates "sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity." The statutory plan provides for a standard which requires the PUCA to charge the plaintiff with the actual value of the money which the plaintiff held for refund to its customers. Victor H. Frauenhofer testified for the plaintiff that it paid 9.2 percent interest on its short term debt and that the interest rate was based upon the prime rate, plus compensating balances. Thus, substantial evidence supports the PUCA's determination of the appropriate interest rate.

## D

At oral argument the PUCA admitted that the trial court correctly determined that the PUCA miscalculated the dates on which the plaintiff received the refunds. Whether this mistake would affect the rates established under the 1978 decision is for the PUCA's expert determination. The arguments and briefs of the PUCA's appellate counsel that the amount is de minimis cannot substitute for a finding by the PUCA itself. See *Connecticut Natural Gas Corporation* v. *Public Utilities Commission,* 29 Conn. Sup. 379, 391, 289 A.2d 711 (1971).

## VI

We have not determined whether, when established, the rates in question were insufficient to allow the plaintiff to cover its operating and capital costs,

a greater rate, as damages for the detention of money after it becomes payable." Public Acts 1979, No. 79-364 § 2 amended General Statutes § 37-3a by increasing the rate of interest allowable on court ordered judgments to 8 percent effective October 1, 1978.

to attract needed capital and to maintain its financial integrity. Therefore, we do not reach the questions (1) whether a rate set for the future is retroactive if it includes compensation for an excess or deficiency in revenues which accumulated after the PUCA established a rate which failed to conform to General Statutes § 16-19e(a) (4) from the time the PUCA established it; (2) whether such a future rate is forbidden if it is retroactive; and (3) whether a plaintiff's failure to ask for preliminary or interim relief would bar amortization of a deficiency.

There is error, the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other judges concurred.