[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs Airtouch Paging, Arch Communications Group, Inc. and Paging Network, Inc. appeal from decisions of the CT Page 3430 defendant Department of Public Utility Control (DPUC) on an application of Southern Connecticut Telephone Company (SNET). The plaintiffs are licensed by the Federal Communications Commission (FCC) under 47 C.F.R. Parts 22 and 90 to provide facilities-based paging services in Connecticut. Their paging services are available to the public on a commercial basis so that they are considered Commercial Mobile Radio Service (CMRS) providers pursuant to 47 U.S.C. § 332(c)(3).[1] In addition, they are telecommunication carriers as defined in 47 U.S.C. § 153(a)(44). The defendant DPUC is a state agency regulating and supervising public service companies providing service to customers in Connecticut pursuant to Title 16 of the Connecticut General Statutes. For the reasons stated below, the appeal is sustained.
The application of SNET sought approval to offer network interconnection arrangements and related services. The DPUC decisions on the application requires CMRS providers to contribute to SNET's costs of implementing an interim plan to allow customers to retain an existing telephone number when charging local service telecommunication provisions.
As stated so succinctly by the court in Bell Atlantic NYNEXMobile, Inc. v. Connecticut Department of Public Utility Control, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 555232, p. 3 (August 14, 1997), "[t]he telecommunications revolution has resulted in a transformation in the telephone service industry from a monopolistic, highly regulated form to a less regulated competitive model." By Public Act 94-83, the Connecticut legislature established a policy plan for the progress of telecommunications in Connecticut and set forth its goals in General Statutes § 16-247a(a). That statute reads:
 Goals of the state. Definitions. (a) Due to the following: Affordable, high quality telecommunications services that meet the needs of individuals and businesses in the state are necessary and vital to the welfare and development of our society; the efficient provision of modern telecommunications services by multiple providers will promote economic development in the state; expanded employment opportunities for residents of the state in the provision of telecommunications services benefit the society and economy of the state; and advanced telecommunications services enhance the delivery of services by public and not-for-profit institutions, it is, therefore, the goal of the state to (1) ensure the universal availability and accessibility of high quality, affordable CT Page 3431 telecommunications services to all residents and businesses in the state, (2) promote the development of effective competition as a means of providing customers with the widest possible choice of services, (3) utilize forms of regulation commensurate with the level of competition in the relevant telecommunications service market, (4) facilitate the efficient development and deployment of an advanced telecommunications infrastructure, including open networks with maximum interoperability and interconnectivity, (5) encourage shared use of existing facilities and cooperative development of new facilities where legally possible, and technically and economically feasible, and (6) ensure that providers of telecommunications services in the state provide high quality customer service and high quality technical service. The department shall implement the provisions of this section, sections 16-1, 16-18a, 16-19, 16-19e, 16-22, 16-247b, 16-247c, 16-247e to 16-247i, inclusive, and 16-247k and subsection (e) of section 16-331
in accordance with these goals.
Part of the expressed goal of achieving competition in telecommunications is met through the implementation of General Statutes § 16-247b which requires the department to initiate proceedings to "unbundle the noncompetitive and emerging competitive functions of a telecommunications company's local telecommunications network that are used to provide telecommunications services and which the department determines, after notice and hearing, are reasonably capable of being tariffed and offered as separate services."
In November 1995, SNET, a local exchange carrier (LEC) and public service company subject to DPUC regulation, applied for DPUC approval to offer network interconnection arrangements and co-carrier unbundling and wholesale tariffs to certified local exchange carrier (CLEC) facilities as non-competitive services. The pertinent part of that application is the offering of service provider local number portability (number portability), which allows an end-user to retain her telephone number when she changes her local service provider. On July 17, 1996, the DPUC issued its decision on the SNET application and found that it could require all telecommunication carriers, including CMRS providers, to share the costs incurred in providing "currently available number portability arrangements." (ROR, Item XII-1, p. 72.) No CMRS provider had participated in the proceeding to this date. (ROR, Item XII-3, p. 3, note 2.) The July 17, 1996 decision CT Page 3432 referred to the June 27, 1996 FCC First Report and Order (FCC Doc. No. 95-116) which promulgated standards for implementing the following mandate in the federal 1996 Telecommunications Act:
 (b) Obligations of all local exchange carriers. . . . Each local exchange carrier has the following duties:
(2) Number portability:
 The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.
47 U.S.C. § 251(b)(2)
The federal act, which promotes competition and reduces regulation in the national telecommunications market, imposes obligations on local exchange carriers to open their networks to competitors. One of those obligations is the implementation of a number portability system. As noted in the FCC Report, Congress recognized that "the ability to change service providers is only meaningful if a customer can retain his or her local telephone number." FCC Report, ¶ 2, pp. 3-4. The FCC found that CMRS providers are telecommunications carriers under the Act so that local exchange carriers are obligated to provide number portability to customers seeking to switch to CMRS providers. The FCC also found "that number portability provides consumers flexibility in the way they use their telecommunications services and promotes the development of competition among alternative providers of telephone and other telecommunications services." FCC Report, ¶ 30.
The Act also addresses the costs of establishing number portability. In § 251(e)(2), the Act provides
 The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.
Referring to this provision, the FCC determined that it should adopt guidelines for the states in adopting cost recovery mechanisms for "currently available cost recovery methods." FCC Order, ¶ 127, p. 66. Paragraph 130 of that order sets forth to whom the states can allocate the costs. CT Page 3433
 Section 251(e)(2) of the Communications Act requires that the costs of providing number portability be borne by "all telecommunications carriers." No party commented on the meaning of the term "all telecommunication carriers." Read literally, the statutory language "all telecommunications carriers" would appear to include any provider of telecommunications services. Section 3 of the Communications Act defines telecommunications services to mean "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of facilities used." Under this reading, states may require all telecommunications carriers — including incumbent LECs, new LECs, CMRS providers, and IXCs — to share the costs incurred in the provision of currently available number portability arrangements. As discussed in greater detail below, states may apportion the incremental costs of currently available measures among relevant carriers by using competitively neutral allocators, such as gross telecommunications revenues, number of lines, or number of active telephone numbers.
FCC Order, ¶ 130, p. 68.
On November 20, 1996, the DPUC reopened the proceedings to investigate, inter alia, the status of implementation associated with number portability cost allocation recovery methodology ordered in the July 17, 1996 decision. (ROR, Item XII-2.) A number of entities participated in these proceedings, including the plaintiffs and Bell Atlantic NYNEX Mobile, Inc., the plaintiff in the companion appeal in this court. A public hearing was held on December 9, 1996 and concluded on January 9, 1997. A draft decision was filed on March 10, 1997. After written exceptions and oral arguments, on March 25, 1997, the final decision issued on how SNET would recover costs it incurs in providing number portability to other service providers and if the DPUC cost recovery method comports with FCC instructions:
 The Department has reopened this proceeding to specifically review and address the recovery of SNET's cost of providing SPLNP as ordered in the July 17, 1996 Decision. The Department concludes that CMRS providers are "relevant carriers" for purposes of this proceeding and, therefore, subject to inclusion in the recommended mechanism for recovery of SNET's SPLNP costs. The Department also concludes it cost recovery mechanism is competitively neutral and consistent with the tests and standards outlined in the FCC Order. Accordingly, the Department reaffirms its July 17, 1996 Decision CT Page 3434 in this docket and shall require all telecommunications carriers (i.e., LECS, CLECS, IXCs and CMRS providers) to be responsible for their proportionate share of SNET's SPLNP costs. Therefore, all CMRS providers will be assessed proportionate shares of the SPLNP development and deployment costs to be incurred by SNET using a cost allocation formula based on a carrier's number of active telephone numbers (or lines) relative to the total number of active telephone numbers (or lines) in SNET's service territory.
(ROR, Item XII-3, pp. 19-20.)
The plaintiffs raise four issues on appeal. First they argue that the DPUC misconstrued the mandates of the 1996 Telecommunications Act. Second, they argue that the record lacks substantial evidence to support the DPUC's conclusion that the plaintiffs would benefit from number portability and are therefore "relevant carriers." They also claim the record lacks substantial evidence to support the DPUC's conclusion that the cost allocation mechanism it adopted is competitively neutral. Finally, the plaintiffs that are in the nature of an illegal tax. Because the court agrees with the plaintiffs on the second argument, it does not address the remaining arguments.
A basic principle of administrative law is that the scope of the court's review is very limited.
 Our Supreme Court has established a firm standard that is appropriately deferential to agency decision making, yet goes beyond a mere judicial `rubber stamping' of an agency's decisions. Connecticut Light Power v. Dept. of Public Utilities Control, 219 Conn. 51, 57
(1991); Woodbury Water Co. v. Public Utilities Commission, 174 Conn. 258, 260 (1978). Courts will not substitute their judgment for that of the agency where substantial evidence exists on the record to support the agency's decision, and where the record reflects that the agency followed appropriate procedures. Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587 (1993); Lieberman v. State Board of Labor Relations, 216 Conn. 253, 262
(1990); Baerst v. State Board of Education, 34 Conn. App. 567, 571, cert. denied, 230 Conn. 915 (1994).
(Internal quotation marks omitted.) Cabasquini v. Commissioner ofSocial Services, 38 Conn. App. 522, 525-26, cert. denied,235 Conn. 906 (1995). General Statutes § 4-183(j) in part provides CT Page 3435
 The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
As to questions of law, the Supreme Court has recently stated that the deferential standard does not apply to a court's review of an "agency's construction of a statute, which is a pure question of law, particularly when the question has not been subjected to prior judicial review." Connecticut Light PowerCo. v. Texas-Ohio Power, Inc., 243 Conn. 635, 644 (1998). Otherwise, deference is accorded to the agency's construction of the statute it is empowered to enforce by applying subsection (6) of General Statutes — 4-183(j). Connecticut Light Power Co. v.Texas-Ohio Power, Inc., supra, 243 Conn. 642. Here, the meaning of "relevant carrier" under the FCC order is not at issue. All parties agree that a "relevant carrier" is one that benefits from interim number portability. Accordingly, the court need not review the DPUC's construction of this phrase.
It is rather a question of whether the record contains substantial evidence to support the DPUC's conclusion that the plaintiffs are "relevant carriers" because they will benefit from the implementation of the interim number portability by SNET:
 The Department is of the opinion that the implementation of interim number portability by a carrier is wholly unrelated to the issue of whether its customers would benefit by the incumbent LEC's implementation of interim number portability. The availability and capability afforded by SPLNP facilitates competition amongst all service providers using the public switched network for some, or all, of its transmission needs. Accordingly, the Department considers that all parties interconnected with SNET's network will benefit by the incumbent LEC's implementation of interim number portability. While CMRS carriers have not been required by either this Department or the FCC to implement interim number portability, CMRS carriers will directly experience benefit from its deployment as wireline CT Page 3436 end-user customers migrate from the LEC (in this case SNET) to a wireless service provider. In this situation, that end-user's telephone number will be ported via SNET's SPLNP to the wireless provider. The Department is not persuaded by BANM's argument that it would not benefit from interim number portability and its contention that CMRS carriers would be subsidizing the wireline industry. BANM Brief, p. 6. As the above illustrates, wireless service providers will derive a direct benefit of having SPLNP as real market impediments to customer migration such as the need to change telephone numbers are reduced. Therefore, the Department dismisses BANM's arguments and considers it to be a relevant carrier for purposes of cost recovery.
(ROR, Item XII-3, p. 16.)
Based upon the record and the FCC Order, the court finds the DPUC erred in applying this conclusion to paging companies because they will not benefit from number portability. The FCC made the following findings in excluding paging companies and certain other CMRS providers from the requirement of offering number portability:
 We do so because such services currently will have little competitive impact on competition between providers of wireless telephone service or between wireless and wireline carriers. . . . If, however, any of these services begins to compete in the local exchange market, or if there are other public interest reasons to require them to provide number portability, we will reassess the exclusion of these services from the requirement to provide number portability.
FCC Order, ¶ 156, p. 82. Additionally,
 Because of the technical hurdles faced by paging and other messaging service providers, the minimal impact that paging and other messaging services have on local exchange competition, and the competitive nature of paging and within the paging industry, we conclude that the costs to paging companies to upgrade their networks to accommodate either interim or long-term number portability solutions, estimated at $30 million by one carrier, outweigh the competitive benefits derived from service provider potability. See, e.g., PCIA Comments at 5 n. 17; PCIA Comments at 5; PCIA Comments at 5; PCIA Reply Comments at 15-16; Arch/Airtouch Paging Comments at 14. CT Page 3437
FCC Order, note 451, p. 82. Indeed, the testimony of Joseph Mullin, the director of communications for Arch Communications, at the public hearing supports the findings of the FCC as to competition and the technical differences between paging companies and other CMRS providers. (1/7/97 tr. pp. 671-680). When asked if paging service is substitute for land line based telephone service Mullin replied: "Absolutely not. It is a one way service primarily. It is noninteractive and. . . it is not a substitute at all." (January 7, 1997 tr. p. 680.) There is no evidence contradicting this testimony in the record.
While the DPUC is certainly not bound to believe the testimony, it cannot make conclusions of law that are not supported by the evidence in the record. The DPUC argues that under Connecticut Natural Gas Corp. v. PUCA, 183 Conn. 128, 137
(1981), it can rely on its own experience, technical competence and specialized knowledge to conclude that the customer migration to those interconnected with SNET's network will benefit these plaintiffs.[2] The language on that case is limiting and doesnot include the findings of fact:
 In its analysis and evaluation of the record evidence the [DPUC] may employ its "experience, technical competence, and specialized knowledge," General Statutes § 4-178(4).
Connecticut Natural Gas Corp. v. PUCA, supra, 183 Conn. 137.
The FCC Order and the plaintiffs' witness' testimony demonstrate that the plaintiffs as paging companies are not competing with LECs for the customers within the local exchange community. Since the record does not support the DPUC's conclusion that these plaintiffs would benefit from interim number portability, the DPUC's assessment of interim number portability costs against these plaintiffs was erroneous. Accordingly, the appeal is sustained.
DiPentima, J.