******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# PAUL FAGAN *v.* CITY OF STAMFORD ET AL.
## (AC 38836)

Keller, Elgo and Bear, Js.

*Syllabus*

The plaintiff, who previously had been employed with the defendant city of Stamford as a police officer and was injured while acting within the scope of his employment, appealed to the trial court from the decision of the defendant City of Stamford Policemen's Pension Trust Fund Board awarding him a disability pension in the amount of 50 percent of his annual compensation. At all relevant times, two distinct disability pensions were available to members of the city's police department under the city's charter and the collective bargaining agreement. Under the city charter, the board was authorized to grant a disability pension equal to 50 percent of the member's compensation during the last year of service to members who, without personal fault or misconduct, were incapacitated in the performance of duty. Pursuant to the collective bargaining agreement, the board was authorized to grant a disability pension equal to 75 percent of the member's base pay at the time of application to police officers who suffered a work related injury, but only when at least two out of three independent medical physicians selected by the board concurred that the member had a permanent or partial disability of 30 percent or more of any part of his or her body. In the present case, in January, 2013, the board approved a 50 percent disability pension to the plaintiff, pursuant to the charter, after two out of three independent medical physicians selected by the board, including C, assigned total disability ratings below 30 percent. Subsequently, in an April, 2013 letter, C, after noting that the plaintiff had asked him to reevaluate his prior report and to apply the fifth edition of a medical guide used to evaluate permanent impairment instead of the sixth edition of the guide, assigned the plaintiff a new disability rating of 36 percent. Thereafter, the plaintiff requested that the board reconsider his application for a 75 percent disability pension under the collective bargaining agreement because two out of three independent medical examiners concurred that his permanent or partial disability ratings totaled 30 percent or more, which the board denied. The trial court subsequently rendered judgment dismissing the appeal, from which the plaintiff appealed to this court. *Held*:

1. The board did not act arbitrarily, capriciously, or in abuse of its discretion in reaching its January, 2013 decision approving a 50 percent disability pension to the plaintiff pursuant to the city's charter; the record contained substantial evidence to support the board's determination that the plaintiff did not meet the requirements for an enhanced disability pension under the collective bargaining agreement, as the evidence available to the board at the time of its decision indicated that at least two out of three independent medical physicians did not concur that the plaintiff had a permanent or partial disability of 30 percent or more, which was required for the plaintiff to receive an enhanced disability pension.

2. The board did not act arbitrarily, capriciously, or in abuse of its discretion in denying the plaintiff's request for the board to reconsider his application for a 75 percent disability pension under the collective bargaining agreement in light of C's April, 2013 letter, which contained new disability calculations that would satisfy the requirements of the collective bargaining agreement for an enhanced disability pension: given the plain language utilized by C in his April, 2013 letter indicating that, pursuant to the plaintiff's request, he had applied the fifth edition of the guide instead of the sixth edition, the board reasonably could have construed that letter as a supplement to, rather than a replacement for, C's prior report, in which the plaintiff's impairment was calculated under an alternative methodology specifically requested by the plaintiff but not by the board, and the board was well within its discretion in accepting as valid C's prior report that applied the sixth edition of the guide, as neither the charter nor the collective bargaining agreement required

application of any particular edition in the independent medical examination process; furthermore, the board's decision to credit C's prior report and to accord little weight to C's later communication in rendering its decision on the plaintiff's disability pension application implicated its exclusive role as arbiter of credibility and the weight to be afforded to particular evidence, and the board was free, in its discretion, to decline to credit the substance of C's later communication because it was made at the behest of the plaintiff.

Argued October 16, 2017—officially released January 30, 2018

*Procedural History*

Appeal from the decision of the defendant pension trust fund board awarding the plaintiff a disability pension in the amount of 50 percent of his annual compensation, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Truglia, J.*, granted the motion for summary judgment filed by the defendant city of Stamford et al.; thereafter, the matter was tried to the court, *Hon. A. William Mottolese*, judge trial referee; judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed*.

*Paul Fagan*, self-represented, the appellant (plaintiff).

*Anthony M. Macleod*, with whom, on the brief, was *James C. Riley*, for the appellees (defendant Policemen's Pension Trust Fund Board of the City of Stamford et al.).

*Opinion*

ELGO, J. The self-represented plaintiff, Paul Fagan, a former police officer for the defendant city of Stamford (city), appeals from the judgment of the Superior Court dismissing his appeal from the decision of the defendant Policemen's Pension Trust Fund Board of the city (board) awarding him a disability pension in the amount of 50 percent of his annual compensation.[1] On appeal, the plaintiff contends that the board improperly denied his request for an enhanced disability pension pursuant to the collective bargaining agreement (agreement) between the city and the Stamford Police Association (association). We disagree and, accordingly, affirm the judgment of the Superior Court.[2]

The relevant facts, as gleaned from the amended return of record that was submitted by agreement of the parties, are largely undisputed. In 1971, the city and the association entered into an "Agreement and Declaration of Trust" (trust agreement), which established the city's "Policemen's Pension Trust Fund" (fund). The stated purpose of the fund is to provide "pension and related benefits to [e]mployees, [r]etirees, their families, dependents, or beneficiaries who satisfy the eligibility requirements . . . ." The fund is administered by the board, whose powers and duties are delineated in the trust agreement. Pursuant to article fifth, § 2, thereof, the board is empowered, inter alia, to "[c]onstrue the provisions of this [t]rust [a]greement, and [its] terms" and to "[f]ormulate, adopt, and promulgate any and all rules and regulations necessary or desirable to facilitate the proper administration of the [fund] . . . ." The board's authority to administer the fund also is memorialized in the city charter. See Stamford Charter § C7-10-1 et seq.

At all times relevant to this appeal, two distinct disability pensions were available to members of the city's police department under the city charter and the agreement, respectively. Pursuant to § C7-20-1 of the Stamford Charter, the board is authorized to grant a disability pension "equal to [50 percent] of the member's compensation during the last year of service" upon finding that a member of the police department "in the actual performance of duty and without personal fault or misconduct, shall have become permanently disabled, so as to be incapacitated in the performance of duty."

In addition, the agreement authorizes the board to award an enhanced disability pension, provided certain criteria are met. Relevant to this appeal is paragraph 9 (K) of the agreement, which provides in relevant part: "Active police officers of the Stamford Police Department who suffer a work related illness or injury at any time during their employment as a police officer shall be eligible for the following [d]isability [p]ension bene-

fits, in addition to those currently existing pursuant to the [c]harter of the [city] and [trust agreement]. . . . [2] Such members shall be entitled to a [d]isability [p]ension equal to [75 percent] of his/her base pay at the time of the [a]pplication if at least two out of three independent medical physicians selected by the [board] in accordance with the provisions of [p]aragraph 9 (K) (1) above,[3] concur that same member has a permanent/ partial disability of [30 percent] or a combined permanent/partial disability of [30 percent] or more of any part of his/her body, including mental disability, and also at least two out of three of said independent medical physicians concur that said member is unable to meet the physical or mental requirements of an entry level patrolman for the Stamford Police Department." (Footnote added.)

Pursuant to its authority under the trust agreement to enact rules and regulations related to the proper administration of the fund, the board promulgated a retirement guide. The retirement guide details the protocols and procedures by which members may retire from the police department. It requires members to submit a letter to both the chief of police and the board that "[m]ust include [the] effective date of retirement and type of retirement." It also requires members who are applying for a disability pension to apprise the board of that request. The retirement guide then explains that "[t]hree [i]ndependent [m]edical [e]xaminations . . . will be arranged for you. These exams must not be with any [d]octor that has seen you in the past. Please review with the [board's office] which [independent medical examination] [d]octors are available for use. . . ." Those independent medical examinations, in turn, are used by the board to determine an applicant's eligibility for a disability pension under the city charter and the agreement.

The plaintiff began his employment with the city's police department in July of 2004. On October 1, 2012, pursuant to the procedures outlined in the retirement guide, the plaintiff sent a letter to the chief of police and the board. That letter stated in relevant part: "I am submitting my notice to retire from the Stamford Police Department after more than eight years of service. I am applying for a disability pension under the [agreement], as I am eligible for the disability benefits listed in the [agreement] in addition to those currently existing pursuant to the charter . . . based on injuries I received in the line of duty. My projected date of retirement at this time is December 7, 2012."[4]

In accordance with both paragraph 9 (K) (1) of the agreement and the retirement guide, three independent medical examinations of the plaintiff were scheduled in October and December of 2012. In the two October, 2012 examinations, the board sent a letter to the physician that stated in relevant part that the board "would

like you to perform an [i]ndependent [m]edical [e]xamination on [the plaintiff]. <u>Please do not proceed if this officer has ever been treated by you</u>. Please advise us if that is the case. The specific information we need in your report includes: [1] Your diagnosis and prognosis. [2] Your opinion of the percentage of disability. [3] Your opinion of the permanency of disability. [4] Your opinion of the causation and job relatedness of the condition. [5] Your opinion if the [o]fficer would be unable to meet the physical requirements of an entry level patrolman." (Emphasis in original.) The relevant language in a November, 2012 letter is virtually identical except that it does not require that the physician's report include his opinion as to whether the plaintiff would be unable to meet the physical requirements of an entry level patrolman. It is undisputed that the board did not direct the physicians to use any specific edition of the Guides to the Evaluation of Permanent Impairment (guide),[5] published by the American Medical Association, in preparing their reports. It further is undisputed that, pursuant to the agreement, the physicians were free to utilize whichever edition of the guide that they preferred.[6] As the plaintiff acknowledges in his principal appellate brief, the agreement "makes no mention of any particular guide to permanent impairment [and] the independent medical examiner may use any guide he/she chooses . . . ."[7]

On October 24, 2012, the plaintiff was examined by Patrick Carolan, a physician with Merritt Orthopaedic Associates, P.C. In his October 25, 2012 report, Carolan assigned a 27 percent disability rating to the plaintiff utilizing the sixth edition of the guide. Carolan further opined that the plaintiff's injuries were causally related to his official duties and that the plaintiff was unable to meet the physical requirements of an entry level patrolman.

On October 31, 2012, the plaintiff was examined by Gary Solomon, a physician with Rehabilitation Consultants, P.C. In his October 31, 2012 report, Solomon assigned a 38 percent disability rating to the plaintiff. Significantly, Solomon did not specify in his report which edition of the guide he utilized in reaching that determination. Rather, he simply indicated that he was "[f]ollowing the [American Medical Association] Guides to the Evaluation of Permanent Impairment . . . ."[8] Like Carolan, Solomon opined that the plaintiff's injuries were causally related to his official duties and that he was unable to meet the physical requirements of an entry level patrolman.

On December 14, 2012, the plaintiff was examined by Kevin Plancher, a physician at Plancher Orthopaedics & Sports Medicine.[9] In his subsequent report, Plancher assigned a 13 percent disability rating to the plaintiff utilizing the sixth edition of the guide. Plancher also opined that the plaintiff's injuries were causally related

to his official duties.

On January 8, 2013, a regular meeting of the board was convened. At that meeting, the board went into an executive session to discuss three retirements.[10] The minutes of that meeting indicate that, when the executive session concluded, a motion "to approve a 50 percent disability pension, as per the charter, to one officer" was unanimously approved by the board. The board then issued a written resolution dated January 8, 2013, which stated: "Resolved that the [board] hereby grant[s] a [d]isability [p]ension, pursuant to [§] 7-20-1 of the [c]harter of the [city], to: [the plaintiff] who has been a member of the Stamford Police Department for over eight years. [He] will be entitled to a total pension of 50 [percent] of [his] annual salary, or $37,427.35 annually, effective January 11, 2013."[11] That resolution was signed by all five members of the board.

Ten days later, the plaintiff sent a letter to Carolan that lies at the heart of this appeal. In that written correspondence, the plaintiff informed Carolan that his October 25, 2012 report was "vastly different from another doctor's opinion of the same injuries." He then explained that, in the "spirit of transparency," he believed that Carolan should know that "Solomon has reached a numerical value of 38 [percent disability] compared to a total of 27 [percent] by [Carolan]."[12] The plaintiff also informed Carolan that he had "applied for a disability pension from the Stamford Police Department and the requirements were a numerical value [of 30 percent] or more . . . and [Carolan] did not reach that numerical requirement based on his ratings not totaling 30 [percent] or more." Accordingly, the plaintiff stated that he had "included [Solomon's] medical report for your review and consideration. If [Carolan] chooses to review the report and make any amendments, as he deems [necessary, it] would be greatly appreciated." The plaintiff at that time also opined that the discrepancy between the disability ratings assigned by Carolan and Solomon "seem[s] to be based on a different schematic or methodology . . . ." The plaintiff then requested that "Carolan consider using the same schematic or methodologies that were used by [Solomon] *to come to a similar numerical value.*" (Emphasis added.) Notably, the plaintiff in that letter never referenced the guide or any particular edition thereof.

The plaintiff then stated that Carolan "has every right to amend his report as he determines necessary, in light of this new information he is receiving today, and in the spirit of accuracy and fairness. Any amendments to the medical report would be considered an act that was executed on [Carolan's] own volition and without duress or influence by any other person. Purposes of this letter were solely for informative reasons. The information provided to [Carolan] was divulged for transparency and accuracy alone. Any amendment/

changes or additions to the report can be forwarded to [the plaintiff], his address is listed below. Kindly respond to this request in writing at your earliest convenience. Thank you in advance for anticipated cooperation concerning this matter regarding the disability ratings of retired police officer Paul Fagan." The letter concluded by listing the plaintiff's home address. It is undisputed that the board was not copied on that written communication or informed in any manner that the plaintiff had sent it to Carolan ten days after the board's January 8, 2013 decision on his application for a disability pension.

The return of record is silent as to what transpired over the ensuing months until Carolan mailed a letter to the plaintiff dated April 9, 2013, which was addressed to the board. In that letter, Carolan stated: "I have been requested by [the plaintiff] to [reevaluate] the independent medical report that I had submitted to you on October 25, 2012. In a letter received from [the plaintiff], he asked that I use the [fifth] [e]dition of the [guide]. Previously, I had used the [sixth] [e]dition."[13] Carolan then detailed eight specific changes "in the calculations of the impairment present" in the plaintiff "[w]hen the [fifth] [e]dition is used," which together resulted in a disability rating of 36 percent.[14] Both the plaintiff and "Attorney William J. Varese" were copied on the bottom of that letter.

The plaintiff then forwarded a copy of Carolan's April 9, 2013 letter to the board under cover dated April 14, 2013. In that correspondence, the plaintiff stated: "I'm writing to inform you that [Carolan] has amended his independent medical exam report regarding my injuries . . . and I am requesting that the [board] reconsider my application for a 75 [percent] disability pension under the [agreement]. Two out of three independent medical examiners [concur] that my permanent/partial disability ratings . . . total 30 [percent] or more."

The board considered the plaintiff's request for reconsideration at its June 12, 2013 meeting. At that time, the board unanimously denied that request. Michael Noto, in his capacity as chairman of the board, sent the plaintiff a letter on June 26, 2013, notifying the plaintiff of that decision. That correspondence stated in relevant part: "[T]he [board] has asked me to confirm to you the [b]oard's decision that you do not qualify for a 75 [percent] disability pension under [p]aragraph 9 (K) (2) of the [agreement]. The [b]oard, by formal vote at its meeting on January 8, 2013, previously granted you a 50 [percent] disability retirement benefit pursuant to [§] C7-20-1 of the [city charter] and found at the same time that you did not meet the criteria for a 75 [percent] disability pension pursuant to [the agreement]. The [b]oard, in reaching that decision, had before it three [i]ndependent [m]edical [e]xamination reports which it accepts as valid reports. Examining physicians may use

either the [fourth], [fifth], or [sixth] editions of the [guide], and the [b]oard did not specify or request that any physician who examined you use a particular edition. Consequently, the [b]oard does not believe it is necessary now to ask for a reevaluation of your condition using any specific edition. A motion for such a reevaluation was made at the [b]oard's June 12, 2013 meeting . . . but failed on a unanimous negative vote."

The plaintiff appealed from that decision to the Superior Court, claiming that the board's decision was "arbitrary and capricious, and an abuse of discretion." Following a hearing, the court rendered judgment dismissing the appeal. In so doing, the court determined that the agreement does not permit an applicant for a disability pension, following the submission of three independent medical examination reports to the board, to thereafter petition one of the medical examiners to reevaluate the applicant's disability rating in light of the report of another medical examiner. The court further determined that such communications, particularly when done without notice to the board, compromise the independence of those examinations. As the court noted in its memorandum of decision, the agreement "evinces an unmistakable intent that the parties to the agreement wish to keep the examination process free from any outside influences or biases and have a process that would promote honesty and integrity." It continued: "[T]he element of independence is essential to the process [set forth in paragraph 9 (K) (2) of the agreement]. To permit either the applicant or the board to communicate with an examiner when dissatisfied with a disability rating would invite attempts to exert improper influence on the decision maker not only by the applicant but perhaps by the board itself if it was unhappy with an examiner's opinion." The court therefore concluded that substantial evidence in the record supported the board's decision not to reconsider its prior disability pension determination. From that judgment, the plaintiff appealed to this court.

Preliminarily, we note the standard applicable to our review of administrative decisions. The board is a creature of municipal enactment and its powers and duties are recognized in both the city charter and the trust agreement. It, therefore, is tantamount to a municipal administrative agency for purposes of appellate review. See *O'Connor* v. *Waterbury*, 286 Conn. 732, 740–41, 945 A.2d 936 (2008). The scope of review of an administrative decision "is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . .

"The substantial evidence rule governs judicial review of administrative fact-finding . . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can

be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the [plaintiff] to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . .

"Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 136–37, 778 A.2d 7 (2001); accord *Ferrier* v. *Personnel & Pension Appeals Board*, 8 Conn. App. 165, 167, 510 A.2d 1385 (1986) (court's function in reviewing decision of municipal pension board "is limited to the examination of the record to determine whether the ultimate decision was factually and legally supported to ensure that the board did not act illegally, arbitrarily or in abuse of its discretion"). "It is fundamental that a plaintiff [bears] the burden of proving that the [municipal board], on the facts before [it], acted contrary to law and in abuse of [its] discretion . . . ." (Internal quotation marks omitted.) *O'Connor* v. *Waterbury*, supra, 286 Conn. 741–42; see also *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 177, 610 A.2d 153 (1992) ("well established judicial principles . . . attach a presumption of validity to decisions of authorized public agencies" and burden therefore rests with party challenging agency determination to demonstrate impropriety).

In addition, "[b]ecause the . . . appeal to the [Superior Court was] based solely on the record, the scope of the [Superior Court's] review of the [board's] decision and the scope of our review of that decision are the same. . . . In other words, the [Superior Court's] decision in this administrative appeal is entitled to no deference from this court." (Internal quotation marks omitted.) *Pictometry International Corp.* v. *Freedom of Information Commission*, 307 Conn. 648, 670 n.21, 59 A.3d 172 (2013). In reviewing this administrative appeal, we therefore focus our attention on the propriety of the decisions of the board.

I

BOARD'S JANUARY 8, 2013 DECISION

We first consider the propriety of the board's decision on January 8, 2013, in which it granted the plaintiff a 50 percent disability pension pursuant to § C7-20-1 of the Stamford Charter. In so doing, the board determined

that the plaintiff did not meet the requirements for an enhanced disability pension under the agreement.

The record contains substantial evidence to support that determination. When the board met at its January 8, 2013 meeting, it had before it three independent medical examination reports prepared by Carolan, Solomon, and Plancher. Only Solomon's report assigned the plaintiff a disability rating of 30 percent or more; Carolan and Plancher's reports assigned disability ratings of 27 and 13 percent, respectively. That evidence indicated that "at least two out of three independent medical physicians" did not "concur that [the plaintiff] has a permanent/partial disability of [30 percent] or a combined permanent/partial disability of [30 percent] or more," as required by paragraph 9 (K) (2) of the agreement. On that evidence, the board concluded that the plaintiff was eligible for a disability pension pursuant to § C7-20-1 of the charter, but not an enhanced one pursuant to paragraph 9 (K) (2) of the agreement. In light of the substantial evidence in the record, we conclude that the board did not act arbitrarily, capriciously, or in abuse of its discretion in reaching its January 8, 2013 decision. The plaintiff has not suggested otherwise in this administrative appeal.

II

BOARD'S JUNE 12, 2013 DECISION

The plaintiff nevertheless asserts that the board acted arbitrarily, capriciously, and in abuse of its discretion in denying his April 14, 2013 request "that the [board] reconsider [his] application for a 75 [percent] disability pension under the [agreement]." He claims that once the board received the April 9, 2013 letter from Carolan containing calculations that resulted in a disability rating of 36 percent, the board was obligated, pursuant to paragraph 9 (K) (2) of the agreement, to discard its prior decision and grant his request for an enhanced disability pension. We disagree.

A

As an initial matter, we note that the plaintiff's position in this administrative appeal is premised on a faulty presumption—that Carolan's April 9, 2013 letter constituted an amendment of his medical opinion on the plaintiff's disability rating intended to supplant that contained in his earlier report of October 25, 2012. The record before us contains no such finding by the board.[15] To the contrary, Noto's June 26, 2013 letter to the plaintiff suggests that the board regarded Carolan's April 9, 2013 letter as merely a submission of alternate calculations under a different methodology.[16] Substantial evidence in the record supports such a determination. In his April 9, 2013 letter to the board, Carolan stated in relevant part: "I have been requested by [the plaintiff] to [reevaluate] the independent medical report that I had submitted to you on October 25, 2012. . . . [The

plaintiff] asked that I use the [fifth] [e]dition of the [guide]. . . . When the [fifth] [e]dition is used, the following changes occur in the calculation of the impairment . . . ." Nowhere in that written correspondence does Carolan disavow his earlier medical opinion or otherwise indicate that the calculations contained in the April 9, 2013 letter were intended to supplant that prior opinion. See footnote 14 of this opinion. Given the plain language utilized therein by Carolan, the board reasonably could construe that letter as a supplement to, rather than a replacement for, Carolan's prior report, in which the plaintiff's impairment was calculated under an alternative methodology specifically requested by the plaintiff but not by the board.

Furthermore, the board was not required, under either the terms of the agreement or its own protocols and procedures, to give any weight to the alternative calculations contained in Carolan's April 9, 2013 letter. The plaintiff concedes, as he must, that neither the charter nor the agreement requires application of any particular edition of the guide in the independent medical examination process. As the plaintiff recognizes in his principal appellate brief, "the independent medical examiner may use any guide he/she chooses . . . ."[17] After conducting his examination of the plaintiff on October 24, 2012, Carolan chose to utilize the sixth edition of the guide in preparing his report to the board. Accordingly, the board was well within its discretion in accepting "as valid" that report, a determination that Noto confirmed in his June 26, 2013 letter to the plaintiff.

B

On a more fundamental level, the board's decision to credit Carolan's October 25, 2012 report in rendering its decision on the plaintiff's disability pension application implicates its exclusive role as arbiter of credibility and the weight to be afforded to particular evidence. As our Supreme Court has observed, "weighing the accuracy and credibility of the evidence" is the province of the administrative agency. *Connecticut Natural Gas Corp.* v. *Public Utilities Control Authority*, 183 Conn. 128, 136, 439 A.2d 282 (1981). Reviewing courts thus "must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." *Briggs* v. *State Employees Retirement Commission*, 210 Conn. 214, 217, 554 A.2d 292 (1989); see also *Standard Oil of Connecticut, Inc.* v. *Administrator, Unemployment Compensation Act*, 320 Conn. 611, 623, 134 A.3d 581 (2016) (reviewing court cannot "substitute its own judgment for that of the administrative agency on the weight of the evidence" [internal quotation marks omitted]); *Tarasovic* v. *Zoning Commission*, 147 Conn. 65, 69, 157 A.2d 103 (1959) ("[i]t is not the function of the court to pass upon the

credibility of the evidence heard" by administrative agency).

The board in the present case credited Carolan's October 25, 2012 report in rendering its January 8, 2013 decision on the plaintiff's disability pension application. Noto's June 26, 2013 letter further confirms that the board adhered to that credibility determination even after it was presented with Carolan's subsequent letter offering different calculations of the plaintiff's disability pursuant to an alternative edition of the guide. Although the record of the board's proceedings on the plaintiff's motion for reconsideration is sparse, Noto's letter suggests that the board accorded little weight to Carolan's supplemental communication, as it indicates that reconsideration of the board's prior decision was not warranted. This appellate tribunal cannot revisit that determination. Id.

Moreover, in making that credibility determination, the board also could consider the undisputed circumstances that gave rise to Carolan's April 9, 2013 letter. As the Superior Court emphasized in its memorandum of decision, the independence of examining physicians is a crucial component of the medical examination process detailed in paragraph 9 (K) (2) of the agreement and the board's retirement guide.[18] In the present case, it is undisputed that, after being notified of the board's January 8, 2013 decision on his disability pension application, the plaintiff unilaterally contacted Carolan without providing any notice to the board and apprised Carolan (1) that a disability rating of "30 percent or more" was required to qualify for the requested disability pension; (2) that Carolan's October 25, 2012 report was "vastly different" from that submitted by Solomon; (3) that Solomon had assigned a 38 percent disability rating to the plaintiff; and (4) that the plaintiff was "requesting that [Carolan] consider using the same schematic or methodologies that were used by [Solomon] to come to a similar numerical value." That correspondence also included a copy of Solomon's medical report "for [Carolan's] review and consideration." By so doing, the plaintiff undermined, if not eviscerated, the independence that is integral to the medical examination process outlined in paragraph 9 (K) (2) of the agreement and the retirement guide.[19] Because Carolan's April 9, 2013 communication to the board expressly states that it was made at the behest of the plaintiff, the board was free, in its discretion, to decline to credit the substance of that communication. See *Briggs* v. *State Employees Retirement Commission*, supra, 210 Conn. 217.

Our review of the record reveals substantial evidence on which the board could determine that reconsideration of its January 8, 2013 decision was unwarranted. The plaintiff, therefore, has not demonstrated that the board's June 12, 2013 decision was arbitrary, capricious,

or an abuse of the board's discretion. We, therefore, conclude that the court properly dismissed the plaintiff's administrative appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Also named as defendants in the plaintiff's complaint were the city's police department and the individual members of the board—Michael Noto, Michael Merenda, Michael Berkoff, Thomas E. Deegan, and Frank J. Mercede. Approximately thirteen months after that appeal was commenced in the Superior Court, the court rendered summary judgment in favor of the city and the police department. The plaintiff does not contest the propriety of that judgment in this appeal.

[2] In hearing administrative appeals such as the present one, the Superior Court acts as an appellate body. See General Statutes § 4-183 (j); see also *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 85, 942 A.2d 345 (2008) (noting that Superior Court sits "in an appellate capacity" when reviewing administrative appeal); *Par Developers, Ltd.* v. *Planning & Zoning Commission*, 37 Conn. App. 348, 353, 655 A.2d 1164 (1995) (distinguishing administrative appeals in which Superior Court "reviewed the agency's decision in an appellate capacity").

[3] Paragraph 9 (K) (1) of the agreement provides in relevant part that the board "shall select the independent medical examiners from [b]oard [c]ertified [p]hysicians who are specialists in the field which involves the particular physical or mental disability claimed by such member." It is undisputed that the board complied with that mandate in the present case.

[4] The plaintiff subsequently notified the board of his request to "extend [his] retirement date until January 11, 2013."

[5] The return of record contains a documentary presentation prepared by the American Medical Association regarding the sixth edition of the guide. It states in relevant part that "[t]he state of Connecticut allows the use of the [f]ourth, [f]ifth, and [s]ixth editions of the [guide]. However, the Connecticut State Medical Society recommends the use of the most recent edition." The record also contains the minutes of the March 6, 2009 meeting of the Connecticut Workers' Compensation Commission, at which the chairman of that commission "advised that it is Commission policy to encourage but not require the use of the [guide]. Physicians are not limited to a particular edition of the [guide] but are expected to be able to objectively justify the basis for their rating."

[6] The return of record in this case does not include any edition of the guide or any excerpt therefrom.

[7] Later in his appellate brief, the plaintiff states that the agreement "essentially leaves the ultimate decision [as to which edition to utilize] to whichever independent medical examiner that the board chooses, and the board is then governed by the [agreement] to follow what the Physician then reports to the board."

[8] In their respective appellate briefs, the parties state that Solomon's report indicates that he utilized the fifth edition of the guide in determining the plaintiff's disability. That report, however, contains no reference to *any* edition of the guide. Moreover, in a May 27, 2013 letter addressed to the president and the vice president of the association, which is contained in the return of record, the plaintiff stated that the reports of the three independent medical examiners that were relied on by the board in reaching their January 8, 2013 decision "all used the sixth edition" of the guide.

[9] At the time of his examination by Plancher, the plaintiff was thirty-five years old.

[10] Because the board conducted its review of the plaintiff's application for a disability retirement and the corresponding independent medical evaluations in an executive session, the record necessarily lacks evidence of the board's deliberations at that time.

[11] The return of record also contains a "Retirement Worksheet" that the board completed on behalf of the plaintiff on January 9, 2013. That worksheet specifies that the plaintiff was to receive a monthly pension of $3118.95 commencing on January 11, 2013. In its appellate brief, the board notes that the plaintiff at that time began collecting his disability benefits "without objection." The plaintiff did not dispute that contention in either his reply brief or at oral argument before this court.

[12] Although the plaintiff represented to Carolan that the information contained in his January 18, 2013 letter was communicated in "the spirit of

transparency" and "the spirit of accuracy and fairness," he failed to mention in that letter that a third medical examiner had assigned a 13 percent disability rating utilizing the same edition of the guide as Carolan.

[13] Carolan's reference to the fifth edition of the guide in his April 9, 2013 letter is, in a word, curious. Although he directly attributes that reference to the written request of the plaintiff, we repeat that, in his January 18, 2013 letter to Carolan, the plaintiff made no mention of the guide or any particular edition. To the extent that further communications transpired between Carolan and either the plaintiff or the legal counsel copied on Carolan's April 9, 2013 letter, those communications are not contained in the record before us.

[14] Carolan's April 9, 2013 letter to the board states in full: "I have been requested by [the plaintiff] to [reevaluate] the independent medical report that I had submitted to you on October 25, 2012. In a letter received from [the plaintiff], he asked that I use the [fifth] [e]dition of the [guide]. Previously, I had used the [sixth] [e]dition. When the [fifth] [e]dition is used, the following changes occur in the calculation of the impairment present within [the plaintiff's] various body parts:

  1. Cervical spine, 18 [percent] of the cervical spine.
  2. Lumbar spine, 6 [percent] of the lumbar spine.
  3. Right shoulder, 4 [percent] of the right upper extremity.
  4. Right elbow, 0 [percent] of the right upper extremity.
  5. Right wrist, 2 [percent] of the right upper extremity.
  6. Right knee, 2 [percent] of the right lower extremity.
  7. Left knee, 2 [percent] of the left lower extremity.
  8. Right foot and ankle, 2 [percent] of the right lower extremity.

If there is any further information necessary regarding this matter, please contact me at the above address."

[15] The return of record does not contain a transcript or minutes of the board's June 12, 2013 hearing, at which it considered the plaintiff's request for reconsideration.

[16] We repeat that, in his January 18, 2013 letter to Carolan, the plaintiff represented that he was requesting a reevaluation of his disability rating "solely for informative reasons." In his subsequent letter to the board, Carolan stated that, at the behest of the plaintiff, he was providing a calculation of the plaintiff's impairment pursuant to the fifth edition of the guide. In response, Noto, in his June 26, 2013 letter to the plaintiff, stated in relevant part that "[e]xamining physicians may use either the [fourth], [fifth], or [sixth] editions of the [guide], and the [b]oard did not specify or request that any physician who examined you use a particular edition. Consequently, the [b]oard does not believe it is necessary now to ask for a reevaluation of your condition using any specific edition." The plain inference of that response is that the board considered Carolan's disability calculations under an alternative edition of the guide to be an unnecessary supplement to the administrative record on which it predicated its January 8, 2013 decision.

[17] It bears repeating that, apart from the abstract assertion contained in the plaintiff's January 18, 2013 letter, there is no evidence in the record indicating that Solomon utilized a different edition of the guide or methodology from that employed in Carolan's October 25, 2012 report. See footnote 8 of this opinion.

[18] For that reason, the retirement guide mandates that an applicant's three independent medical examinations "must not be with any doctor that has seen you in the past." The board's appointment letter to those physicians likewise cautioned: "Please do not proceed if this officer has ever been treated by you." (Emphasis omitted.) In the letters that were sent to Carolan, Solomon, and Plancher, that sentence was underlined for emphasis.

[19] In his principal appellate brief, the plaintiff makes much of the use of the term "concur" in paragraph 9 (K) (2) of the agreement, which provides in relevant part that a member of the city's police department is eligible for an enhanced disability pension "if at least two out of three independent medical physicians . . . concur that same member has a permanent/partial disability of [30 percent] or a combined permanent/partial disability of [30 percent] or more . . . ." The plaintiff thus argues that the agreement requires that the three independent medical examiners "must review each other's reports [prior to making] a decision."

It is well established that individual words or clauses of a contract "cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part." *Levine* v. *Advest, Inc.*, 244 Conn. 732, 753, 714 A.2d 649 (1998); see also Restatement (Second), Contracts § 202, comment (d), p. 88 (1981) ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence,

the sentence when it becomes part of a paragraph."). When properly read in the context in which the word "concur" arises in the agreement between the city and the association, the plaintiff's assertion is absurd, as it contravenes the plain intent of those parties in setting forth a mechanism for the independent medical evaluation of a member's physical impairment by three different physicians. See *Welch* v. *Stonybrook Gardens Cooperative, Inc.*, 158 Conn. App. 185, 198, 118 A.3d 675 (courts "will not construe a contract's language in such a way that it would lead to an absurd result"), cert. denied, 318 Conn. 905, 122 A.3d 634 (2015); see also *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 729, 682 A.2d 1026 ("[t]he law is clear that a contract includes not only what is expressly stated therein but also what is necessarily implied from the language used" [internal quotation marks omitted]), cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). The examination process outlined in the agreement and the retirement guide requires separate examinations and reports, and not a group effort by the physicians.

---