******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

APPENDIX

NORTHWEST HILLS CHRYSLER JEEP, LLC, ET AL.
*v.* DEPARTMENT OF MOTOR VEHICLES ET AL.*

Superior Court, Judicial District of New Britain
File No. CV-18-6042924-S

Memorandum filed April 15, 2019

*Proceedings*

Memorandum of decision on plaintiffs' appeal from decision by named defendant. *Appeal dismissed.*

*James J. Healy*, *Jason T. Allen*, pro hac vice, and *Richard N. Sox*, pro hac vice, for the plaintiffs.

*Eileen Meskill*, assistant attorney general, and *George Jepsen*, former attorney general, for the named defendant et al.

*Charles D. Ray*, *Shawn S. Smith*, *George W. Mykulak*, pro hac vice, and *Caitlin W. Monahan*, pro hac vice, for the defendant FCA US, LLC.

*Jay B. Weintraub*, *John L. Bonee* and *Eric H. Rothauser*, for the defendant Mitchell Dodge, Inc.

*Opinion*

HUDDLESTON, J. In this administrative appeal, four automobile dealers assert that the defendants Department of Motor Vehicles and its commissioner, Michael R. Bzdyra (collectively, department), improperly denied their protest to the decision of the defendant FCA US, LLC (FCA), to establish a new Jeep dealership in Canton. They assert that the department (1) failed to comply with its statutory mandate to consider the existing circumstances of two of the dealers, (2) made findings that are not supported by substantial evidence with respect to three statutory factors, and (3) made irreconcilable findings with respect to two of the factors. FCA and the department, in separate briefs, disagree. After considering all the arguments of the parties, and reviewing the entire administrative record, the court concludes that the department's decision is neither incomplete nor inconsistent and is supported by substantial evidence. Accordingly, for the reasons stated below, the appeal is dismissed.

## LEGAL FRAMEWORK

In Connecticut, the relationships between manufacturers and dealers of motor vehicles are governed by General Statutes §§ 42-133r through 42-133ee. These provisions recognize the "need for intra-brand competition." *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 569 n.14, 473 A.2d 1185 (1984). Section 42-133r (14) defines " '[r]elevant market area' " as "the area within a radius of fourteen miles around an existing dealer or the area of responsibility defined in a franchise, whichever is greater." The law "does not guarantee an exclusive right to operate a dealership within a fourteen mile radius, but rather requires the [C]ommissioner of [M]otor [V]ehicles to demonstrate good cause, as defined in the statute, for denying the addition or relocation of a dealer in the objecting dealer's relevant market area." (Internal quotation marks omitted.) *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, supra, 569 n.14.

If a manufacturer wants to add a new dealer or to relocate an existing dealer within the relevant market area of an existing dealer, General Statutes § 42-133dd (a)[1] requires the manufacturer to notify the Commissioner of Motor Vehicles and each existing dealer of its intention. If an existing dealer files a protest with the commissioner, the manufacturer cannot proceed until the commissioner has held a hearing and has determined whether there is good cause for denying the manufacturer's plan. The manufacturer bears the burden of proving that good cause exists for permitting the proposed establishment or relocation. Section 42-133dd (c) sets out eleven nonexclusive "circumstances" or factors to be considered in determining whether good cause exists.[2]

Mitchell Dodge, Inc., doing business as Mitchell Chrysler Dodge (Mitchell), operates a Chrysler, Dodge, Ram (CDR) dealership presently located at 416 Hopmeadow Street in Simsbury. There are thirty CDR dealerships in Connecticut; all but four of them also sell the Jeep line. Mitchell is one of the four dealers currently without the Jeep line.

The four plaintiffs operate Chrysler, Dodge, Jeep, Ram (CDJR) dealerships in Connecticut. Northwest Hills Chrysler Jeep, LLC (Northwest), operates a CDJR dealership in Torrington. Gengras Chrysler Dodge Jeep, LLC (Gengras), operates a CDJR dealership in East Hartford. Crowley Chrysler Plymouth, Inc., doing business as Crowley Chrysler Jeep Dodge Ram (Crowley), operates a CDJR dealership in Bristol. Papa's Dodge, Inc. (Papa's), operates a CDJR dealership in New Britain. Each of their dealerships is within fourteen miles of Mitchell's present location.

In 2007, FCA's predecessor, DaimlerChrysler Motors Company, LLC, looked to add the Jeep line to Mitchell's franchise at its present location. It gave the statutorily required notice to the dealers in the relevant market area. Northwest, Gengras, Crowley, and Papa's filed a protest pursuant to § 42-133dd (a), and the proposal to establish the Jeep line at Mitchell's present location was withdrawn on March 5, 2007.

On May 5, 2016, FCA gave notice to the department and to affected existing Jeep dealers that Mitchell intended to construct a facility at 71 Albany Turnpike in Canton, where it would relocate its existing CDR dealership, and requested to add the Jeep line. On May 23, 2016, Northwest, Gengras, Crowley, and Papa's protested the establishment of the Jeep line. They did not protest the relocation of Mitchell's CDR dealership.[4]

In FCA's dealer agreements, a "sales locality" is a geographic area of responsibility defined by specific census tracts. These are nonexclusive areas. Mitchell and the protesting dealers are located within three sales localities. Mitchell's present location, Gengras, and Papa's are located within the FCA's Hartford sales locality. Mitchell's proposed location is also within the Hartford sales locality. Crowley is within the FCA's Bristol sales locality, and Northwest is within the FCA's Torrington sales locality.

FCA further divides sales localities into "trade zones," also defined by census tracts. The Hartford sales locality is divided into five trade zones: Enfield, East Hartford, New Britain, Rockville, and Simsbury. Of the five trade zones, two—Enfield and Simsbury—do not presently have Jeep dealerships, and are known in the trade as "open points."

Section 42-133dd (c) requires the commissioner or his designee to "take into consideration the existing circumstances," which "includ[e], but [are] not limited to," eleven circumstances. The final decision addressed each of the eleven specified circumstances.

Section 42-133dd (c) (1) requires consideration of the "permanency and size of investment made and the reasonable obligations incurred by the existing new motor vehicle dealers in the relevant market area . . . ." As to this consideration, the department found that the existing motor vehicle dealers "have made significant and permanent investments, and have incurred financial obligations in their dealership facilities, located in the respective relevant market area." The department acknowledged FCA's argument that the dealers' investments had been made over a period of years, that the protesting dealers "are strong dealers who have successfully completed and succeeded against other dealers," including Mitchell in its present location, and that the dealers' agreements with FCA are expressly " 'non-exclusive' . . . ."

Section 42-133dd (c) (2) requires consideration of the "growth or decline in population and new car registrations in the relevant market area . . . ." As to this consideration, the department found that between 2000 and 2015, the population in the Hartford sales locality grew by over 40,000, or 4.9 percent. In the Simsbury trade zone, where the proposed Jeep location would be established, the population grew by 9.1 percent, which the department found to be the highest percentage of growth of all trade zones in the Hartford sales locality and higher than the growth in the Torrington and Bristol sales localities. The department found that both population and household growth is projected to be less than 1 percent between 2015 and 2020, rising slightly but remaining stable. Vehicle registrations in Connecticut rose by a significant percentage from 2010 through 2015, with Jeep registrations increasing by 172.5 percent. The department noted, however, that sales "peaked and plateaued in 2016," a nationwide trend that may continue. The department observed that the protesting dealers saw this slowing growth as support for their position that another Jeep dealership is not needed.

Section 42-133dd (c) (3) requires consideration of the "effect on the consuming public in the relevant market area . . . ." The department found that the consuming public would benefit from the addition of the Jeep line at the proposed location. Route 44 (Albany Turnpike) in Canton has evolved into an "auto row"—an area where numerous vehicle brands have established dealership locations and compete within the vicinity of each other. Presently located near the proposed location are competitors of Jeep, including Chevrolet, Acura, Subaru, Volkswagen, Nissan, Toyota, Land Rover, and Honda

dealers. The department found that "[a]uto rows are now common, and provide a convenience to consumers in having the ability to shop and compare competing brands at dealerships in close proximity." The department also found that drive time is significant to consumers. Although the parties disagreed as to the amount of time consumers would save if a new Jeep line were added at the proposed location, the department found that distances and drive times from the proposed location to the protesting dealers' locations are not insignificant, and that location on such an auto row would increase interbrand and intrabrand competition, to the consumer's benefit.

Section 42-133dd (c) (4) requires consideration of "whether it is injurious or beneficial to the public welfare for a new dealer to be established . . . ." The department found that the addition of construction and dealership based jobs, payroll and property taxes, and sales and use tax revenue would be beneficial to the public welfare in the Simsbury trade zone and particularly in Canton, the site of the proposed location. The department acknowledged the protesting dealers' argument that the benefit in construction jobs was only speculative, as there were only projections by Mitchell and one of the FCA experts as to what expenditures Mitchell would make if it were granted the Jeep dealership. The department observed that Mitchell could not be expected to have a detailed proposal in place, since it did not know if or when it would be allowed to add the Jeep line, and its ability to obtain the necessary approvals and financing for the project required the approval of the Jeep line at the proposed location. The department concluded that approval of the Jeep vehicle line "is not injurious to the public welfare."

Section 42-133dd (c) (5) requires consideration of "whether the dealers of the same line make in that relevant market area are providing adequate competition and convenient customer care for the motor vehicles of the line make in the market area including the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel . . . ." As to this consideration, the department found that the protesting dealers have adequate service facilities, equipment, supply of motor vehicle parts, and qualified service personnel. The protesting dealers already compete successfully with Mitchell in a number of segments and franchises, including new CDR vehicles, the sale of used, certified preowned vehicles, including CDR and Jeep, warranty and out of warranty service on CDR and Jeep vehicles, and sales of parts for CDR and Jeep vehicles. As the department observed, however, the Simsbury trade zone has never had a Jeep dealership, and sales of new Jeeps in that trade zone have to be handled by in-selling. The only option for consumers in that area is to search for and purchase a new Jeep from a dealership outside the

area, which, with Internet advertising, could be a dealer other than the protesting dealers. Television and Internet advertising by the protesting dealers reaches far beyond their relevant market areas, into adjoining states.

In considering § 42-133dd (c) (5), the department discussed registration effectiveness, a measure used by the automotive industry to assess brand performance. Registration effectiveness compares brand registrations within a territory to the expected number of registrations. It is distinct from dealer performance, which is calculated on "[m]inimum [s]ales [r]esponsibility," or MSR. As the department observed, "[d]ealer performance measures whether a dealer has captured the opportunity for sales assigned to it." FCA's dealers in the Hartford sales locality meet their MSRs, but the Hartford sales locality is only 84 percent registration effective. This indicates lost sales for the brand and supports the need for another Jeep dealer.

Section 42-133dd (c) (6) considers "whether the establishment of a new dealer would increase or decrease competition . . . ." FCA argued that a new Jeep dealer would result in better prices, better choices, and better service as a result of the visibility of the proposed location, additional expected advertising by Mitchell, and increased interbrand competition. FCA also argued that existing dealers were not selling enough Jeeps to meet their expected market share. On the other hand, the protesting dealers argued that Jeep parts and service are already available in the Simsbury trade zone at Mitchell's existing location, and the addition of the Jeep line for sales would result in only "[minimally improved] convenience." The department found that, on balance, the addition of the Jeep line at the proposed location would increase competition.

Section 42-133dd (c) (7) requires consideration of "the effect on the relocating dealer of a denial of its relocation into the relevant market area . . . ." The department observed that, although this case involves the establishment of a new Jeep dealer rather than the relocation of an existing Jeep dealer, consideration of the eleven circumstances set out in § 42-133dd (c) are not exclusive. Considering the effect of a denial of the Jeep line on Mitchell, the department found that Mitchell had been losing money for years in its present location, and the possibility that it would have to relinquish its CDR dealership was relevant in terms of Mitchell's overall financial health. Loss of Mitchell's CDR dealership would adversely affect the customers who currently use Mitchell's services at its present location.

Section 42-133dd (c) (8) requires consideration of "whether the establishment or relocation of the proposed dealership appears to be warranted and justified based on economic and marketing conditions pertinent to dealers competing in the community or territory,

including anticipated future changes . . . ." The department made extensive findings with respect to this issue. It found that the annual number of new vehicle sales for all manufacturers increased significantly from 2009–2010, when it was approximately twelve million units, to 2016, when sales were in excess of seventeen million units. In Connecticut, the Jeep line, measured by registrations, increased from 3945 in 2010 to 10,751 in 2015.

The department further found that when Chrysler emerged from bankruptcy in 2009 and FCA acquired certain of its assets, one of FCA's goals was to establish Chrysler, Dodge, Jeep, and Ram as a unified franchise under one roof. This consolidation plan was presented to the Bankruptcy Court both as a plan of survival for the brand and a plan that would benefit dealers and consumers. Approximately 60 to 70 percent of FCA's sales in the United States come from Jeep. In light of the greatly increased consumer preference for sport utility vehicles (SUVs), FCA is increasing production of Jeeps and introducing new models, with the expectation of selling 24 percent more Jeeps by 2020 than are currently sold. Existing dealers have benefited from this trend and will continue to benefit from planned new products and increased production volume.

The department found that the protesting dealers do sell Jeeps into the Simsbury trade zone, but most of their sales are made near their dealerships. It is a priority of FCA to establish dealerships, including the Jeep line, in auto rows such as the one in Canton to encourage cross-shopping and to be competitive with non-FCA brands.

The department found that Northwest's auto group includes a Chevrolet, Buick, GMC, Cadillac dealership in Torrington that competes with Davidson Chevy, which is less than a mile from Mitchell's proposed location in Canton. In addition, the family that owns Northwest also owns O'Neill Chevrolet Buick in Avon, approximately three and a half miles from Davidson Chevy, and also owns a Honda dealership in Torrington that competes with Hoffman Honda in West Simsbury.

The department found that Crowley's dealership group includes Nissan Crowley in Bristol, which competes with Hoffman Nissan in Canton. Hoffman Nissan is located near Mitchell's proposed location. Crowley also owns a Volkswagen dealership in Plainville that competes with Mitchell Volkswagen in Canton, less than a mile from Mitchell's proposed location for adding the Jeep line.

The department found that Mitchell owns both 71 and 91 Albany Turnpike in Canton. Mitchell currently operates a Subaru dealership at 71 Albany Turnpike. If granted a Jeep dealership, Mitchell plans to build a new facility for Subaru at 91 Albany Turnpike and to

renovate the proposed location at 71 Albany Turnpike for the CDJR dealership. The proposed location is already zoned for an auto dealership. The expert for the protesting dealers admitted that it is very difficult to find dealership locations in the Northeast that are not severely constrained by space or zoning.

The department acknowledged that a June, 2014 Hartford Market Study by FCA listed Simsbury as one of FCA's lowest market priorities in the greater Hartford market. After Mitchell advised FCA of its plan for the proposed location, however, FCA changed its priorities. The department found that such a change was to be expected.

The department concluded that the increased popularity of SUVs; intense marketing on television, the Internet, and in print media; and heightened interbrand competition justify allowing the Jeep line at the proposed location. The department found that it is necessary to balance the interests of consumers, the local community, the establishing dealer, the vehicle manufacturer, and the existing dealers.

Section 42-133dd (c) (9) requires consideration of "the reasonably expected market penetration of the line-maker motor vehicle for the community or territory involved, after consideration of all factors which may affect said penetration, including, but not limited to, demographic factors such as age, income, education, size class preference, product popularity, retail lease transactions, or other factors affecting sales to consumers of the community or territory  . . . ." As to this consideration, the department explained that "[m]arket penetration is the share a particular brand gets of a competitive set. Market penetration is the same as market share: how much business is transacted relative to the business available. Registration effectiveness is how well a brand does relative to what is expected from the brand." The department found that in the Hartford sales locality, Jeep's existing market share is less than its expected market share, using 2015 numbers. In that year, Jeep's expected market share in the Hartford sales locality was 9.85 percent, but its actual market share was 8.24 percent. If Jeep had achieved its expected market share in 2015, it would have sold 2086 vehicles in the Hartford sales locality, but in fact it sold only 1744 vehicles.

Section 42-133dd (c) (10) requires consideration of "the economic impact of an additional franchise or relocated motor vehicle dealership upon the existing motor vehicle dealers of the same line make in the relevant market area to be served by the additional franchisee or relocated motor vehicle dealership  . . . ." The department found that the addition of a Jeep dealership at the proposed location would result in some financial loss to the existing dealers. Although FCA's expert contended that there is sufficient lost opportunity from

interbrand competition to have the new dealership established and not take any sales from the existing dealers, the protesting dealers testified that the proposed location would cause a financial loss to them and might result in a reduction of employees, with a corresponding loss in customer service. The department found that the protesting dealers all have well established Jeep dealerships with well regarded sales and service departments. It found that "[o]ne cannot say that the consumer will abandon the [protesting dealers'] dealerships and patronize a new dealership such as the [p]roposed [l]ocation based solely on convenience for the purchasing of a new Jeep." The department observed that both FCA and the protesting dealers acknowledge the significance of Jeep sales to a CDJR dealership. It found that although motor vehicle sales have leveled off, Jeep sales are expected to remain strong, providing continued opportunity for both the protesting dealers and Mitchell.

Section 42-133dd (c) (11) requires consideration of "the retail sales and service business transacted by the existing dealers of the same line make in the market area to be served by the proposed new or relocated dealer as compared to the business available to them during the three-year period immediately preceding notice." As to this consideration, the department found that Jeep registration effectiveness in the Hartford sales locality indicated lost Jeep sales in the years preceding the notice. In 2015, the Hartford sales locality had the third lowest registration effectiveness in the state, at 83.6 percent, and the Bristol RMA was at 85.7 percent. The department found that the protesting dealers have been in-selling into the Simsbury trade zone, where there is no new Jeep dealership. It further found that the establishment of a new Jeep dealership in the Simsbury trade zone would not prevent the protesting dealers from continuing to in-sell into the Simsbury trade zone.

The department concluded that, "[b]ased upon the evidence presented, and taking into consideration criteria set forth in . . . § 42-133dd, good cause exists for permitting the establishment of a new Jeep dealer at 71 Albany Turnpike in Canton . . . ." It accordingly dismissed the protests of the protesting dealers and ordered that FCA may establish a new Jeep dealer at 71 Albany Turnpike in Canton. This appeal followed.

### SCOPE OF REVIEW

The plaintiffs appeal pursuant to General Statutes § 4-183.[5] "[J]udicial review of the commissioner's action is governed by the Uniform Administrative Procedure Act . . . General Statutes §§ 4-166 through 4-189 . . . and the scope of that review is very restricted . . . ." [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclu-

sions drawn from those facts are reasonable." (Citation omitted; internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000). "Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Schallenkamp* v. *DelPonte*, 229 Conn. 31, 40, 639 A.2d 1018 (1994). "The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action." (Internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 676, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001). "In determining whether an administrative finding is supported by substantial evidence, the reviewing court must defer to the agency's assessment of the credibility of witnesses. . . . The reviewing court must take into account contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Internal quotation marks omitted.) *Frank* v. *Dept. of Children & Families*, 312 Conn. 393, 411–12, 94 A.3d 588 (2014).

Our Supreme Court has repeatedly stated that "administrative tribunals are not strictly bound by the rules of evidence and . . . may consider exhibits [that] would normally be incompetent in a judicial proceeding, [as] long as the evidence is reliable and probative." *Lawrence* v. *Kozlowski*, 171 Conn. 705, 710, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977). "It is axiomatic, moreover, that it is within the province of the administrative hearing officer to determine whether evidence is reliable . . . and, on appeal, the plaintiff bears the burden of proving that the commissioner, on the facts before him, acted contrary to law and in abuse of his discretion . . . . Neither this court nor the [Appellate Court] may retry the case or substitute its own judgment for that of the [hearing officer with respect to] the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citations omitted; internal quotation marks omitted.) *Do* v. *Commissioner of Motor Vehicles*, 330 Conn. 651, 667–68, 200 A.3d 681 (2019).

Section 4-183 (j) requires affirmance of an agency's decision unless the court finds that substantial rights of the person appealing have been prejudiced by the claimed error. "The complaining party has the burden

of demonstrating that its substantial rights were prejudiced by the error." (Internal quotation marks omitted.) *Miller* v. *Dept. of Agriculture*, 168 Conn. App. 255, 266, 145 A.3d 393, cert. denied, 323 Conn. 936, 151 A.3d 386 (2016). "It is fundamental that a plaintiff has the burden of proving that the [agency], on the facts before [it], acted contrary to law and in abuse of [its] discretion . . . ." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, supra, 254 Conn. 343–44.

## DISCUSSION

The plaintiffs advance three arguments in support of their appeal. First, they assert that the department committed legal error by failing to make specific findings as to each of the eleven statutory considerations for each protesting dealer. Second, they assert that certain factual findings are not supported by substantial evidence and that two of the findings are inconsistent with each other. Third, they argue that the department's legal conclusion does not follow legally and logically from certain undisputed facts. More generally, they argue that the protesting dealers were successful Jeep dealers and consistently exceeded FCA's goals; that FCA's decision to add a Jeep dealer in Canton was based on the personal preference of a single manager who had formerly worked for Toyota and wanted Jeep to be located near Toyota; and that the evidence showed a contracting automobile market, a stagnant population, "extreme" Jeep competition, and an insufficient supply of Jeeps for current dealers.

In response, FCA argues that the plaintiffs' arguments are waived, contradict the arguments they made before the department, misconstrue the dealer statute, and are legally immaterial. FCA also argues that substantial evidence supports the department's decision. The department argues that the hearing officer properly considered all the statutory factors as to all of the plaintiffs, that the findings are not inconsistent and are supported by substantial evidence, and that the department is afforded considerable discretion in weighing the statutory factors.

The court has reviewed the entire administrative record, including the transcripts, the exhibits, the post-hearing briefs, and the final decision. Based on its review, it concludes that the plaintiffs have not met their burden of showing any prejudicial error.

### A

The plaintiffs' first argument is that the hearing officer failed to make specific findings as to each dealer on each statutory point, thereby depriving certain of the plaintiffs of their right to a decision based on their own circumstances. Similar arguments have been rejected at least twice in the past. See *A-1 Auto Service, Inc.* v. *Dept. of Motor Vehicles*, Superior Court, judicial

district of Hartford-New Britain, Docket No. CV-96-0558549 (July 18, 1996) (*Maloney, J.*) (basis of hearing officer's decision was clear despite failure to state subordinate conclusions as to some factors); *Mario D'Addario Buick, Inc.* v. *Dept. of Motor Vehicles*, Superior Court, judicial district of New Britain, Docket No. CV-01-0505960-S (October 12, 2001) (*Schuman, J.*) (hearing officer not required to make specific findings on each factor but merely to consider them all). Courts have considered whether the basis for the ultimate conclusion is clear and reflects consideration of the statutory factors. In *A-1 Auto Service, Inc.*, the court observed that the hearing officer's ultimate conclusion was simply that " 'existing circumstances'. . . do not establish good cause for denying the new franchise. As noted, the findings of fact are explicit and thorough; they completely cover the circumstances as required by the statute; and they provide an understandable and reasonable basis for the ultimate decision. If the hearing officer failed to label some subordinate conclusions as such or failed to state some subordinate conclusions explicitly, the plaintiff has not demonstrated any material prejudice as a result."

The plaintiffs here claim that the department failed to make findings about Northwest and Crowley as to the fifth, ninth, and eleventh statutory factors. The fifth factor directs the department to consider "whether the dealers of the same line make in that relevant market area are providing adequate competition and convenient customer care for the motor vehicles of the line make in the market area including the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel . . . ." General Statutes § 42-133dd (c) (5). Contrary to the plaintiffs' claim, the department expressly found that all of the protesting dealers have adequate service facilities, equipment, supply of motor vehicle parts, and qualified service personnel. Final Decision, ¶ 25. Turning from service to sales, the department observed that the Simsbury trade zone has never had a new Jeep dealership, with the result that consumers in that trade zone had to search for and purchase new Jeeps outside the area. It further observed that while the dealers in the Hartford sales locality met their minimum sales requirements, registration effectiveness (a measure of market share) was only 84 percent. In sum, the department found that dealers of the same line make were providing adequate competition in service but not adequate or convenient competition in sales of new Jeeps in the proposed location. This conclusion was supported by substantial evidence in the record.

The plaintiffs also claim that the department failed to make necessary findings about the ninth factor, which directs the department to consider "the reasonably expected market penetration of the line-maker motor vehicle for the community or territory involved, after

consideration of all factors which may affect said penetration, including, but not limited to, demographic factors such as age, income, education, size class preference, product popularity, retail lease transactions, or other factors affecting sales to consumers of the community or territory . . . ." General Statutes § 42-133dd (c) (9). The plaintiffs claim that the department erred in failing to focus on Canton, the proposed location, as "the community or territory involved." The court disagrees. The statute employs undefined alternatives—"community or territory involved"—rather than the statutorily defined "relevant market area." By using broad, undefined alternative terms, the statute clearly affords the department substantial discretion to determine the most relevant "community or territory involved." The department did not abuse its discretion in focusing on the Hartford sales locality in which the proposed location was located. Substantial evidence supports the department's finding that Jeep's market share in the Hartford sales locality was 8.24 percent, lower than its expected market share of 9.85 percent, with sales of only 1744 vehicles as compared to expected sales of 2086 vehicles.

The plaintiffs also claim that the department erred by failing to make specific findings concerning the retail sales of Jeeps in Canton and in Northwest's relevant market area, as they claim is required by the eleventh factor. That factor requires the department to consider "the retail sales and service business transacted by the existing dealers of the same line make in the market area to be served by the proposed new or relocated dealer as compared to the business available to them during the three-year period immediately preceding notice." General Statutes § 42-133dd (c) (11). The plaintiffs claim that the department was required to make specific findings as to market penetration in the "Canton/Simsbury market" as well as the Bristol and Northwest sales localities. The department and FCA disagree. They argue that the hearing officer correctly discussed the Hartford sales locality as "the market area to be served by the proposed new or relocated dealer." The court agrees with the defendants. Subsection (c) (11) requires consideration of the market area to be served by the proposed new Jeep dealer. The department reasonably focused on the Hartford sales locality in which the new dealership would be established. It observed that registration effectiveness, an industry measure of market share, indicated lost sales in the Hartford sales locality and in the Bristol relevant market area as well. It further noted that the protesting dealers had been in-selling into the Simsbury trade zone for years and could continue to do so after a new Jeep dealership was established.

As FCA argues, many of the statutory factors overlap with each other. By focusing on alleged failures with respect to specific factors, the plaintiffs ignore the fact

that many of the findings relate to more than one factor. Review of the decision as a whole demonstrates that the department considered each protesting dealer's sales and service activities in its relevant market area. It identified each of the protesting dealers and their relevant market areas. Final Decision, ¶¶ 1, 12 and 13. It acknowledged their significant and permanent investments in their dealerships. Id., ¶ 15. It found that all the protesting dealers provided adequate competition in the service of vehicles and met their minimum sales responsibility under their agreements with FCA. Id., ¶¶ 25 and 28. It found, however, that registration effectiveness in the Hartford sales locality was only 84 percent, despite the fact that all protesting dealers advertised in, and made sales into, that sales locality. Id., ¶¶ 26 through 28 and 37.

The department construed § 42-133dd (c) as requiring the department to balance "the interests of consumers, the local community, the establishing dealer, the vehicle manufacturer, and the existing dealers . . . ." Id., ¶ 43. This was clearly correct. Section 42-133dd (c) evidences concern for existing dealers in subdivisions (1), (5), (8), (10) and (11). Concern for the consuming public, and for competition generally, is explicitly addressed in subdivisions (3), (4) and (5) and implicit in several other subdivisions. Concern for fairness to the manufacturer is explicit or implicit in subdivisions (2), (3), (5) and (9). Concern for relocating dealers is expressly addressed in subdivision (7). Section 42-133dd (c) does not exist solely to protect the interests of existing dealers, but to assure healthy competition in the market. Healthy competition, the statute assumes, is good for the consuming public and ultimately benefits manufacturers and dealers as well. The final decision as a whole reflects the department's consideration of the factors set out in the statute.

B

The plaintiffs next argue that the department's findings as to subdivisions (6), (7) and (8) are not supported by substantial evidence, and that the findings as to subdivisions (3) and (10) are irreconcilable. "In determining whether an administrative finding is supported by substantial evidence, a court must defer . . . to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." (Internal quotation marks omitted.) *Bancroft* v. *Commissioner of Motor Vehicles*, 48 Conn. App. 391, 400, 710 A.2d 807, cert. denied, 245 Conn. 917, 717 A.2d 234 (1998).

Under subdivision (6), the department found that on balance, allowing the addition of a Jeep dealership at the proposed location would increase competition. Final Decision, ¶ 31. The plaintiffs dispute this finding, arguing that the evidence demonstrated that vehicle pricing is at historically low levels in the relevant market

areas. They also argue that there were not enough Jeep vehicles to meet demand. Finally, they argue that competition for Jeep service cannot be enhanced because Mitchell already performs Jeep service at its present location.

The plaintiffs' arguments are not well founded. There was substantial evidence that locating a dealership in an auto row near dealerships of competing brands increases interbrand competition. Such evidence came not only in the testimony of FCA's dealer placement managers and its expert witness, but also in the admissions of some of the protesting dealers on cross-examination. Jonathan Gengras, for instance, admitted that being in an auto row "stimulates competition to be among a number of dealerships where consumers can cross-shop." Transcript, May 22, 2017, p. 155. He further admitted that the proposed location was part of an auto row and was a "great location to shop for a vehicle." Id., pp. 155–56. Domenic Papa admitted that competition provides consumers with better prices, better choices, and better attention from the dealers. Transcript, May 19, 2017, pp. 14–15.

The plaintiffs' claim that there were not enough Jeeps to meet demand was countered by evidence that FCA was building a second plant for Jeep Wranglers, one of the most popular models, and expected to increase production enough to increase sales by 24 percent within a couple of years. The hearing officer credited this evidence. See Final Decision, ¶ 36.

The plaintiffs' claim that competition for Jeep service would not be enhanced because Mitchell already services Jeeps is not persuasive. There was evidence that Mitchell was at a disadvantage in getting Jeep service work because many customers choose to service their vehicles at the dealership where they purchased it. Indeed, there was evidence that dealers use the point of sale to try to sell service contracts to enhance the likelihood that purchasers will return to that dealership for service.

The plaintiffs also claim that the department's findings with regard to subdivision (7) are not relevant to the analysis and not supported by substantial evidence. Subdivision (7) directs the department to consider the effect of a denial of a relocation request on a relocating dealer. The department acknowledged, in the final decision, that it was not required to address subdivision (7) because the protests before it involved the establishment of a new Jeep dealer rather than the relocation of an existing one. It noted, however, that the list of factors in § 42-133dd (c) is nonexclusive and deemed it appropriate to consider the effect of denying the Jeep line to Mitchell. It found that the negative financial impact on Mitchell was well documented; Mitchell had been losing money at its present location for years. It also considered the possibility that Mitchell would be

forced to relinquish its CDR franchise if not granted Jeep. It considered that termination of Mitchell's CDR franchise would adversely affect consumers who are presently using Mitchell's services at its present location.

The plaintiffs assert that the department's finding was not supported by substantial evidence because Mitchell's president admitted that Mitchell had remained in business throughout the recession and that, if he decided to stop operating the existing CDR franchise, he could sell it. But, as before, the plaintiffs discuss only the evidence that was favorable to their position and ignore the substantial evidence that supports the department's findings. The plaintiffs do not dispute that Jeep sales constitute 60 to 70 percent of the new vehicle sales at their dealerships. As demand for SUVs has increased, there has been a corresponding decrease in the demand for sedans. FCA managers testified that Jeep and light truck sales have driven the success of the business in recent years. Without the ability to sell new Jeeps, Mitchell is at a substantial disadvantage in relation to the dealers who sell all the CDJR lines. Mitchell testified that his CDR dealership had been losing money for at least six years and that if he was not allowed to add Jeep he would have to think "long and hard" about whether to continue to operate it. William Doucette, the dealer placement manager for FCA's Northeast region, testified that Mitchell was at a substantial disadvantage without Jeep. He testified that Mitchell had been unable to make needed upgrades to its Simsbury facility because it lacked the revenue from Jeep sales to support such an investment. Doucette thought it likely that Mitchell would voluntarily terminate his CDR franchise if he could not add Jeep. The department did not err in considering that denying the Jeep line to Mitchell would adversely affect its business.

The plaintiffs also argue that the department's findings as to subdivision (8) are not supported by substantial evidence. Section 42-133dd (c) (8) requires the department to consider "whether the establishment or relocation of the proposed dealership appears to be warranted and justified based on economic and marketing conditions pertinent to dealers competing in the community or territory, including anticipated future changes . . . ." The plaintiffs first argue that the department improperly focused on historical conditions and failed to give adequate attention to "anticipated future changes . . . ." More specifically, they claim that the automotive industry is expected to contract, that there are no "growth projects" in Canton, and school enrollment is decreasing. They next argue that the department failed to reconcile FCA's evolving "justifications" for the new Jeep dealership. They point to a June, 2014 market study which showed that FCA did not believe there was a market justification for adding Jeep in Canton at that time, and then assert that FCA

reversed course in August, 2014, when Mitchell first proposed to relocate to Canton and add the Jeep brand there. The plaintiffs claim that the only thing that changed was the availability of the Canton property and an FCA manager's desire to be near Toyota.

The claim that the department failed to consider existing economic and marketing factors and anticipated future changes is refuted by the decision. Although some of the findings are addressed under headings other than the heading specifically discussing subdivision (8), it is clear that the hearing officer considered the slowing population growth (¶ 18), the peak and plateau of vehicle sales in 2016 (¶ 19), the plaintiffs' argument that the slowing of population and household growth supported denial of the Jeep addition (¶ 20), the marketing advantages of locating a dealership on an auto row (¶ 21), the increase in new vehicle sales between 2009 and 2016, with a 172.5 percent increase in the sale of Jeeps (¶ 34), the importance of the Jeep line to FCA dealers, contributing 60 to 70 percent of all FCA's sales in the United States (¶ 36), FCA's intention to increase production of Jeeps and to introduce new Jeep models, with its expectation of increasing Jeep sales by 24 percent by 2020 (¶ 36), and the recognition that while existing dealers sell into the Simsbury trade zone, most of their sales are made near their dealerships (¶ 37). The department further observed that the existing dealers who had dealerships for brands other than FCA brands were already competing with dealers in Canton—for instance, Northwest's auto group includes a Chevrolet dealership in Torrington that competes with a Chevy dealership less than a mile from the proposed location for Mitchell's Jeep dealership, and Crowley's Nissan dealership in Bristol competes with Hoffman Nissan in Canton. The department cited to specific testimony and exhibits that supported its findings. The department did not fail to conduct a proper analysis of economic and marketing conditions, including anticipated future changes; it simply disagreed with the plaintiffs' view of the evidence. That it chose to credit FCA's witnesses and expert more often than the plaintiffs' was its prerogative as the finder of fact. As our Supreme Court and Appellate Court have observed, " 'weighing the accuracy and credibility of the evidence' is the province of the administrative agency. *Connecticut Natural Gas Corp.* v. *Public Utilities Control Authority*, 183 Conn. 128, 136, 439 A.2d 282 (1981). Reviewing courts thus 'must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part.' *Briggs* v. *State Employees Retirement Commission*, 210 Conn. 214, 217, 554 A.2d 292 (1989); see also *Standard Oil of Connecticut, Inc.* v. *Administrator, Unemployment Compensation Act*, 320 Conn. 611, 623, 134 A.3d 581 (2016) (reviewing court cannot 'substi-

tute its own judgment for that of the administrative agency on the weight of the evidence' . . .); *Tarasovic* v. *Zoning Commission*, 147 Conn. 65, 69, 157 A.2d 103 (1959) ('[i]t is not the function of the court to pass upon the credibility of the evidence heard' by administrative agency)." *Fagan* v. *Stamford*, 179 Conn. App. 440, 458, 180 A.3d 1 (2018).

The plaintiffs' emphasis on FCA's June, 2014 market study is equally unavailing. The hearing officer acknowledged that in a June, 2014 study, FCA ranked four communities as higher priorities for improved performance than Canton/Simsbury, but a follow-up study in August of 2014 recommended relocating Mitchell to the proposed location and adding the Jeep line.[6] Final Decision, ¶ 39. The hearing officer concluded that it was reasonable for FCA to adjust its priorities, in light of the popularity of the Jeep line, when Mitchell offered it the opportunity to locate a CDJR dealership at a highly visible location, on a busy thoroughfare, in close proximity to competing dealerships, that was already zoned for an auto dealership. Id., ¶¶ 21, 36, 38, 42 and 44. As the plaintiffs' own expert admitted, in the Northeast it is very difficult to find dealership locations with good frontage and good buildings that are not severely constrained by space or zoning. Id., ¶ 42. The plaintiffs disagree with the department's judgment, but it is one that was well supported by the evidence and well within the discretion afforded the department.

The plaintiffs repeatedly argue that the sole reason for FCA's change in priorities was that its market representative, Dan Cantrell, had previously been employed by Toyota and personally desired to locate Jeep dealerships near Toyota dealerships. Plaintiffs' Brief, pp. 3, 4, 15, 16, 20, 22 and 23. This argument ignores the testimony of FCA national and regional dealer placement managers, who testified about the importance of locating dealerships near their competitors, a fact acknowledged by the plaintiffs' witnesses as well. It also ignores the analysis in FCA's expert report, which the hearing officer cited frequently throughout the final decision. The hearing officer was entitled to reject the plaintiffs' argument and to credit the substantial evidence presented by FCA as to the competitive importance of locating dealerships near their main competitors.

The plaintiffs also argue that two of the department's subordinate findings are "incompatible." Under § 42-133dd (c) (3), which considers the effect on the consuming public, the department found that the consuming public would benefit from the addition of the Jeep line at the proposed location because it is convenient to shop and compare competing brands in an auto row and because it would reduce drive times to a dealership. Final Decision, ¶¶ 21 and 22. Under § 42-133dd (c) (10), which considers the economic impact of a new

dealership on existing dealers, the department found that consumers would not abandon existing dealers solely based on convenience. Id., ¶ 50. These findings are not inconsistent. As the department found, both FCA and the protesting dealers presented evidence that there would be some financial loss to existing dealers as the result of the addition of a Jeep dealership at the proposed location, but the probable amount of the loss was vigorously disputed. Id., ¶ 47. FCA presented evidence that there was sufficient lost opportunity to have the proposed location come into business and not take any sales from the existing dealers, while the protesting plaintiffs presented evidence that the proposed location would affect them economically and possibly require them to reduce the number of their employees. Considering the conflicting evidence, the department found that the protesting dealers "all have well established Jeep dealerships, with [well regarded] sales and services departments. One cannot say that the consumer will abandon the [protesting dealers'] dealerships and patronize a new dealership such as the [p]roposed [l]ocation based solely on convenience for the purchasing of a new Jeep." Id., ¶ 50. The department concluded that because Jeep sales are expected to remain strong, there would be "ample opportunity" for both the protesting dealers and Mitchell. Id., ¶ 51.

Under subdivision (3), the department found that addition of a Jeep dealership at the proposed location would be convenient for the consuming public and would reduce drive times to Jeep dealerships. Under subdivision (10), however, it found that convenience would not be the sole factor considered by consumers. It found that the protesting dealers had well established and well regarded dealerships. It is not unreasonable to infer that some consumers may prefer to continue to do business with dealers they know and trust even if a new dealer is more convenient. Moreover, a principal reason for locating a dealership in an auto row is to increase interbrand competition. There was substantial evidence to support the finding that Jeep sales were expected to remain strong and that there was "ample opportunity" for both the protesting dealers and for Mitchell, including improving Jeep's market share in comparison to other brands. The department's findings are not inconsistent. It is not unreasonable to find that consumer behavior is affected by many factors, including convenience, loyalty, and proximity to competing choices.

### C

The plaintiffs' final argument is that the department's ultimate conclusion—that there is good cause to add a Jeep dealership at the proposed location—cannot follow legally and logically from the undisputed facts. The plaintiffs present a list of purported "undisputed" facts, some of which are undisputed, some of which are not

material, and some of which were disputed or countered by other evidence. It is undisputed, for instance, that the protesting dealers are located within fourteen miles of the proposed location; that is what gave them the right to file a protest. Several of the purported facts deal with Jeep sales in Canton. Even if undisputed, those facts would not be dispositive because the relevant market areas were larger than Canton. The plaintiffs assert that there is no FCA policy to place Jeep near Toyota; even if true, this assertion certainly ignores abundant evidence that FCA preferred to locate dealerships in auto rows, in close proximity to competing brands, to enhance interbrand competition. The plaintiffs assert that they all met their minimum sales requirements and had not been told they needed to improve their sales in their assigned markets or in Canton. But, as the department found, the manufacturer had wanted to establish a Jeep dealership in the Simsbury trade zone since 2007, when it first proposed to add Jeep to the Mitchell franchise in Simsbury. Its previous effort to add Jeep in the Simsbury trade zone provided notice that it believed that the Jeep brand was not adequately represented there.

In sum, the department did its job: it considered the evidence presented by the plaintiffs, it considered the evidence presented by FCA and Mitchell, and it decided which evidence to credit. It cited frequently to the testimony and report of FCA's expert, indicating that it found that evidence to be credible. It weighed the interests of the existing dealers, the consuming public, the community affected, the manufacturer, and the dealer to be most affected by its decision, Mitchell. Despite the plaintiffs' efforts to recast these matters as legal issues, the issues identified by the plaintiffs are factual in character, and the ultimate conclusion is one in which the department is afforded considerable discretion. It is not the role of this court to second-guess the factual findings and discretionary decisions of an administrative agency. See *Frank* v. *Dept. of Children & Families*, supra, 312 Conn. 411–12 ("[t]he reviewing court must take into account contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" (internal quotation marks omitted)).

## CONCLUSION

The department's decision adequately addressed the statutory circumstances it was directed to consider. Its factual findings are supported by substantial evidence and are not inconsistent or incomplete. Accordingly, the department's decision must stand, and the plaintiffs' appeal is dismissed. Judgment shall enter for the defendants.

* Affirmed. *Northwest Hills Chrysler Jeep, LLC* v. *Dept. of Motor Vehicles*, 201 Conn. App. , A.3d (2020).

[1] General Statutes § 42-133dd (a) provides in relevant part: "In the event that a manufacturer or distributor seeks to enter into a franchise establishing a new dealer or relocating an existing dealer within or into a relevant market area where the same line make is then represented, the manufacturer or distributor shall in writing, by certified mail, first notify the commissioner and each dealer in such line make in the relevant market area of its intention to establish a new dealer or to relocate an existing dealer within or into that market area. Within twenty days of receiving such notice or within twenty days after the end of any appeal procedure provided by the manufacturer or distributor, any such dealer may file with the commissioner a protest concerning the proposed establishment or relocation of such new or existing dealer. When such a protest is filed, the commissioner shall inform the manufacturer or distributor that a timely protest has been filed, and that the manufacturer or distributor shall not establish or relocate the proposed dealer until the commissioner has held a hearing, nor thereafter, if the commissioner determines that there is good cause for denying the establishment or relocation of such dealer. In any hearing held pursuant to this section, the manufacturer or distributor has the burden of proving that good cause exists for permitting the proposed establishment or relocation. . . ."

[2] General Statutes § 42-133dd (c) provides: "In determining whether good cause has been established for not entering into a franchise establishing a new dealer or relocating an existing dealer for the same line make, the commissioner shall take into consideration the existing circumstances, including, but not limited to: (1) The permanency and size of investment made and the reasonable obligations incurred by the existing new motor vehicle dealers in the relevant market area; (2) growth or decline in population and new car registrations in the relevant market area; (3) effect on the consuming public in the relevant market area; (4) whether it is injurious or beneficial to the public welfare for a new dealer to be established; (5) whether the dealers of the same line make in that relevant market area are providing adequate competition and convenient customer care for the motor vehicles of the line make in the market area including the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel; (6) whether the establishment of a new dealer would increase or decrease competition; (7) the effect on the relocating dealer of a denial of its relocation into the relevant market area; (8) whether the establishment or relocation of the proposed dealership appears to be warranted and justified based on economic and marketing conditions pertinent to dealers competing in the community or territory, including anticipated future changes; (9) the reasonably expected market penetration of the line-maker motor vehicle for the community or territory involved, after consideration of all factors which may affect said penetration, including, but not limited to, demographic factors such as age, income, education, size class preference, product popularity, retail lease transactions, or other factors affecting sales to consumers of the community or territory; (10) the economic impact of an additional franchise or relocated motor vehicle dealership upon the existing motor vehicle dealers of the same line make in the relevant market area to be served by the additional franchisee or relocated motor vehicle dealership; and (11) the retail sales and service business transacted by the existing dealers of the same line make in the market area to be served by the proposed new or relocated dealer as compared to the business available to them during the three-year period immediately preceding notice."

[3] Over seven days in May, 2017, a department hearing officer conducted the required hearing. He heard testimony from four FCA managers, a representative of each of the protesting dealers, the president of Mitchell [Dodge, Inc.], two expert witnesses for FCA, and two expert witnesses for the protesting dealers. FCA and the protesting dealers introduced some 190 exhibits and submitted posthearing briefs. The hearing officer subsequently issued a final decision on January 19, 2018, from which these facts are drawn. (The decision is misdated January 19, 2017, on the first page, but correctly dated on page 11.)

[4] Pursuant to § 42-133dd (b) (1), the protest provisions of § 42-133dd (a) do not apply to "the relocation of an existing dealer within that dealer's area of responsibility under its franchise, provided that the relocation shall not be at a site within six miles of a licensed dealer for the same line make of motor vehicle . . . ."

Mitchell's proposed relocation was within its area of responsibility and was more than six miles from the protesting CDJR dealers.

[5] General Statutes § 4-183 (j) sets out the statutory scope of review for

administrative appeals. It provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

[6] FCA's national head of market representation, Bashar Cholagh, testified that the June, 2014 analysis was a preliminary study, based primarily on data from 2013, and the August, 2014 study was updated to reflect data through April and May of 2014, as well as insights gained from driving the market area in July, 2014. Notably, the June, 2014 study identified lost sales opportunities in the Hartford market area and recommended putting a CDJR dealership in the Simsbury trade zone. See Exhibit R2, Bates Stamp 9656. The June, 2014 study also included a trade zone map that indicated the importance of locating CDJR dealerships in auto rows near their main competitors. Id., Bates Stamp 9686.

———————————————